In re AIR CRASH DISASTER NEAR CHICAGO, ILLINOIS ON MAY 25, 1979.

Appeal of McDONNELL DOUGLAS CORPORATION.

In re AIR CRASH DISASTER NEAR CHICAGO, ILLINOIS ON MAY 25, 1979.

Appeal of PLAINTIFFS IN ALL THE CONSOLIDATED CASES IN MASTER FILE NO. MDL 391.

In re AIR CRASH DISASTER NEAR CHICAGO, ILLINOIS ON MAY 25, 1979.

Appeal of LLOYD'S BANK CALIFORNIA as Executor of Estates of Williard R. Nary and Julia T. Nary, Deceased.

Nos. 80–1812, 80–1813, 80–1814.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 25, 1980.
Decided Jan. 5, 1981.

600

Norman J. Barry, Joseph P. Della Maria, Jr., Roger J. Guerin, Christopher G. Walsh, Jr., Rothschild, Barry & Myers, Chicago, Ill., for McDonnell Douglas.

Thomas D. Allen, Robert E. Haley, Kathy P. Saxton, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for American Airlines, Inc.

Lee S. Kreindler, Melvin I. Friedman, Frank G. Fleming, Kreindler & Kreindler, New York City, and George F. Archer, Chicago, Ill., for plaintiffs.

Charles F. Thompson, Jr., John M. Lamont, Richard L. Horwitz, Reid, Ochsenschlager, Murphy & Hupp, Aurora, Ill., for Lloyd's Bank, Cal.

Before SPRECHER, BAUER and CUDAHY, Circuit Judges.

SPRECHER, Circuit Judge.

█ This case presents complex conflicts-of-law questions regarding the allowance of punitive damages in wrongful death actions arising out of an air crash disaster. The law of the place of the disaster, the law of the place of manufacturer of the airplane, and the law of the primary place of business of the airline do not allow punitive damages; but, the law of the primary place of business of the manufacturer of the airplane and the law of the place of maintenance of the airline do allow punitive damages. We find that, under each of the applicable state choice-of-law rules, punitive damages cannot be allowed against either the manufacturer or the airline.

### I

The stark facts of the tragedy resulting in this litigation are undisputed. On May 25, 1979, a DC–10 jet airplane, designed and built by McDonnell Douglas Corporation ("MDC"), operated by American Airlines ("American") was scheduled to fly from Chicago, Illinois to Los Angeles, California as American's Flight 191. Shortly after takeoff from O'Hare International Airport, however, the plane lost an engine and crashed in the immediate vicinity of the airport. All two hundred seventy-one persons aboard the plane, and two persons on the ground, were killed.

Now there are one hundred eighteen wrongful death actions arising out of the crash. These cases were originally filed in Illinois, California, New York, Michigan, Hawaii, and Puerto Rico.[1] Many of the complaints allege wrongful death counts which request awards of punitive as well as compensatory damages. The plaintiffs and their decedents are and were residents of California, Connecticut, Hawaii, Illinois, Indiana, Massachusetts, Michigan, New Jersey, New York, Vermont, Puerto Rico, Japan, the Netherlands, and Saudi Arabia.

The defendants in these cases are MDC and American. MDC is a Maryland corporation having its principal place of business, now and at the time of the accident, in Missouri. The plaintiffs contend MDC's conduct in the design and manufacture of the DC–10 was egregious. That alleged misconduct occurred in California. American is a Delaware corporation. American's place of business prior to 1979 was New York. During 1979, American moved its principal place of business to Texas. Some plaintiffs contend that, on the date of the crash, American's principal place of business was in Texas, but American contends that its principal place of business on that date was New York. The plaintiffs contend that American's conduct regarding the maintenance of the DC–10 was egregious.

---

1. The cases have been transferred to the Northern District of Illinois for pretrial purposes by order of the Judicial Panel on Multidistrict Litigation.

That alleged misconduct occurred in Oklahoma, site of American's maintenance base.

Both defendants moved in district court to strike the claims for punitive damages on the ground that such claims failed to state legally sufficient claims for relief. The parties disputed many issues: whether certain states allowed punitive damages, the choice-of-law theories to be used regarding certain states, and the results of the application of the choice-of-law theories which were used.

Using the choice-of-law rules of each state where these actions had originally been filed, the district court arrived at the following results. Under the Illinois "most significant relationship" test, the district court found that the law of the state of the principal place of business should prevail with regard to the issue of punitive damages. Finding that New York was American's principal place of business at the time of the crash and does not allow punitive damages, and that Missouri, MDC's principal place of business, does allow the equivalent of punitive damages, the court allowed the motions to strike punitive damage claims against American but not against MDC.

Under the California "comparative impairment" test, the district court held that the policies of the state of the principal place of business would be impaired more than the policies of the state of misconduct if those policies were not applied. Thus, the court allowed the motion to strike punitive damage claims with regard to American but not with regard to MDC. The district court reached the same result with regard to the actions filed in New York, Michigan, Puerto Rico, and Hawaii.

Although generally agreeing with the district court regarding which states allow pu-

nitive damages and the choice-of-law theories to be used, we reach a different result in applying those theories. For the reasons discussed below, we find that the motions to strike claims of punitive damages should be granted with regard to both MDC and American.

## II

■ At the outset, we must first determine whether we confront "real" rather than "apparent" conflicts between the laws to be applied.[2] This requires a determination, first, of the law regarding punitive damages in the relevant states: Illinois, Missouri, California, Oklahoma, New York, Texas and Hawaii. After this determination, it will then be necessary to determine the conflict-of-law theories of the forum states and to apply those theories.

■ Illinois is the place of the injury and, under various theories, its law regarding punitive damages might be used. The Illinois Supreme Court has clearly held that Illinois does not permit the recovery of punitive damages in a wrongful death action. *Mattyasovszky v. West Towns Bus Co.*, 21 Ill.App.3d 46, 313 N.E.2d 496, 502 (1974), *aff'd*, 61 Ill.2d 31, 330 N.E.2d 509, 512 (1975).

■ Plaintiffs argue that the Illinois law on punitive damages is in a state of flux, citing recent cases allowing punitive damages in survival actions. *National Bank of Bloomington v. Norfolk & Western Ry. Co.*, 73 Ill.2d 160, 23 Ill.Dec. 48, 383 N.E.2d 919 (1978); *Churchill v. Norfolk & Western Ry. Co.*, 73 Ill.2d 127, 23 Ill.Dec. 58, 383 N.E.2d 929 (1978). But in these *Norfolk* cases, damages were sought under the Public Utilities Act, which expressly provides for punitive damages.[3] In *National*

---

2. *See* Currie, *The Disinterested Third State*, 28 L. & Contemp.Prob. 754, 757–58 (1963). Professor Currie's use of the terms "true conflict," "false conflict" and "apparent true conflict" refers specifically to his theory of government interest analysis. *See generally* Kay, *The Use of Comparative Impairment To Resolve True Conflicts: An Evaluation of the California Experience*, 68 Cal.L.Rev. 577 (1980) [hereinafter referred to as Kay, *Comparative Impairment*].

Our use of this terminology will not be so narrow. All laws must be carefully examined to determine that a conflict actually exists, under any choice-of-law theory, before application of the theory.

3. The Public Utilities Act, Ill.Rev.Stat.1969, ch. 111⅔, § 77 provides:

[I]f the court shall find that the act or omission was willful, the court may in addition to

*Bank of Bloomington*, the Wrongful Death Act was not at issue; and in *Churchill*, the surviving plaintiff sought recovery for her own loss, not on the basis of the loss of life of her husband. The Illinois Supreme Court held in the *Norfolk* cases that where a statute specifically provides for punitive damages, nothing in the Survival Act, Ill. Rev.Stat. ch. 3, § 339 (1964) now Ill.Rev. Stat. § 110½, par. 27–6 (1977), or in the *Mattyasovszky* decision operates to abate that *statutory* liability for punitive damages.[4] Thus, the *Norfolk* cases do not vitiate the holding of the *Mattyasovszky* case. Moreover, the argument that the *Norfolk* cases overturned the rule against recovery of punitive damages in a wrongful death action was impliedly rejected by an Illinois court in *Rusher v. Smith*, 70 Ill.App.3d 889, 26 Ill.Dec. 405, 410, 388 N.E.2d 906, 911–12 (1979).[5] To be sure, the *Rusher* case is not binding because it is an Appellate Court decision. But it does nothing to detract from the voice of the Illinois Supreme Court in *Mattyasovszky*. That declaration of state law is, of course, binding on this Court. *Erie RR Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Whether Missouri, MDC's principal place of business, allows the equivalent of punitive damages is hotly disputed by the litigants. Although Missouri's wrongful death act does not by its express terms provide for punitive damages, Mo.Ann.Stat. §§ 537.080 *et seq.* (Vernon 1979), it does authorize the trier of fact to consider the "mitigating or aggravating circumstances attending the death." Mo.Ann.Stat. § 537.-090 (Vernon 1979). Damages for "aggravating circumstances" have been permitted by Missouri wrongful death statutes since 1855, and have consistently been considered punitive or exemplary by the Missouri Supreme Court. *Parsons v. Missouri Pacific Ry.*, 94 Mo. 286, 6 S.W. 464, 466–67 (1888); *Haehl v. Wabash Ry. Co.*, 119 Mo. 325, 24 S.W. 737, 741 (1893). Damages for "aggravating circumstances" in death cases depend on proof of "willful misconduct, wantonness, recklessness, or want of care indicative of indifference to consequences," *Wiseman v. Missouri Pacific Railroad*, 575 S.W.2d 742 (Mo.App.1978), a standard commonly associated with the award of punitive damages.[6]

MDC argues that the case of *Glick v. Ballentine Produce Inc.*, 396 S.W.2d 609 (1965), *appeal dismissed*, 385 U.S. 5, 87 S.Ct.

4. The Illinois Supreme Court stated:
 In *Mattyasovszky*, where the decedent died instantly, his estate sought to recover punitive damages which the decedent, *under the common law*, might have recovered had he survived. The court summarily denied recovery of punitive damages because the Survival Act itself has "never been thought to authorize the award of punitive damages." ... The court, however, did not base its denial of common law punitive damages on the broad proposition that punitive damages are unrecoverable when injury results in death ....
 Here, in contrast to *Mattyasovszky*, punitive recovery was sought, not under the common law, but directly under the Public Utilities Act.... The Survival Act itself neither authorizes nor prohibits punitive damages. It is merely the vehicle by which the cause of action, created by the Public Utilities Act, survives the death of the injured person when the action would otherwise have abated at common law.
 383 N.E.2d at 924 (emphasis in original).

5. The majority opinion stated that "[t]he law is well settled that a party cannot recover punitive damages in a wrongful death action in Illinois." The majority cited *Mattyasovszky* but did not discuss the *Norfolk* cases. 388 N.E.2d at 911–12. But the dissent had cited both *Mattyasovszky* and the *Norfolk* cases for the proposition that it was *not* "well-settled that a party cannot recover punitive damages in a wrongful death action in Illinois." *Id.* at 912. Thus, the majority opinion rejected the argument that the *Norfolk* cases changed the law barring punitive damages in wrongful death cases.

6. *See also Williams v. Excavating and Foundation Co.*, 230 Mo.App. 973, 93 S.W.2d 123, 127 (1936) ("to whatever extent the damages are increased by reason of aggravating circumstances attending the death of the deceased, such increase is punitive in its nature ....") and *Contestible v. Brookshire*, 355 S.W.2d 36, 42 (Mo.1962), *cert. denied* and *appeal dismissed*, 371 U.S. 68, 83 S.Ct. 155, 9 L.Ed.2d 119 (1962).

44, 17 L.Ed.2d 5 (1966), conclusively establishes that damages awarded because of "aggravating circumstances" are *not* punitive. But MDC's argument, based on selective quotation, is not persuasive. In *Glick*, a wrongful death case, the plaintiffs attempted to recover damages in excess of the then existing statutory monetary limit. The Missouri Supreme Court disallowed the excess amount requested. In so doing, the Missouri Court stated that there was no recovery under Missouri law for punitive damages, "as such," but that "aggravating circumstances" could be considered by the jury so long as the total verdict did not exceed the statutory limit. 396 S.W.2d at 616–17.[7] Thus, we find, and the *Glick* decision is not inconsistent with our finding, that the damages allowed under Missouri law with regard to "aggravating circumstances" can be considered within the meaning of "punitive" damages as sought by the plaintiffs.

 California is the place of MDC's conduct in the design and manufacture of the DC–10. California courts have uniformly held that the statute which allows punitive damages generally in tort actions [8] applies with regard to survival actions only and not with regard to wrongful death actions. *See Tarasoff v. Regents of the University of California*, 17 Cal.3d 425, 450, 131 Cal.Rptr. 14, 33, 551 P.2d 334, 353 (1976); *Pease v. Beech Aircraft Corp.*, 38 Cal.App.3d 450, 113 Cal.Rptr. 416 (1974); and Note, 15 Santa Clara Law., 507 (1975). *See also In Re Paris Air Crash*, 622 F.2d 1315 (9th Cir. 1980). Although the plaintiffs question the strength of this policy, *see* discussion in

Part VI, they do not question the fact that the California courts do deny punitive damages in death cases. Pl. Br. 80–1812, at 35. Thus, we find that California law does not allow punitive damages in wrongful death cases.

 Oklahoma is the site of American's maintenance headquarters. The parties do not dispute the fact that Oklahoma does allow punitive damages. 12 Okl.Stat.Ann. 1053(C) (1979–80 Cum.Supp.).

 New York was American's principal place of business during part of 1979. We find that New York does not allow an award of punitive damages in wrongful death actions. *See Robert v. Ford Motor Co.*, 73 App.Div.2d 1025, 424 N.Y.S.2d 747 (1980); *Barrett v. State*, 85 Misc.2d 456, 378 N.Y.S.2d 946 (Ct.Claims 1976). *See also* N.Y.Est., Powers & Trusts L. § 5–4.3 (McKinney 1967).

 Texas was American's principal place of business during part of 1979 and has been its principal place of business thereafter. It is undisputed that Texas does allow a punitive damage recovery, by spouses or descendants, in wrongful death actions. *See* Tex.Const. Art. 16 § 26 (1976). *See also Scoggins v. Southwestern Elec. Service Co.*, 434 S.W.2d 376 (Tex.Civ.App. 1968); *Pace v. McEwen*, 574 S.W.2d 792 (Tex.Civ.App.1978).

Hawaii is the domicile of one of the plaintiffs; one action was originally filed there. The parties have not been able to identify the governing choice-of-law rule that would be applied by Hawaii courts in personal injury actions. The defendants argue that,

---

**7.** The court stated:
> There is no recovery in a death case for punitive damages, as such. Such a petition may plead, and appropriate instructions may submit, the question of "mitigating or aggravating circumstances," if the evidence justifies it. *Williams v. Excavating & Foundation Co.*, 230 Mo.App. 973, 93 S.W.2d 123, 127; *Hertz v. McDowell*, 358 Mo. 383, 214 S.W.2d 546. While added damages because of "aggravating circumstances" may, in a sense, be considered as punitive in nature, they are not to be submitted as such nor are they to be submitted separately, *nor in any total verdict and judgment to exceed the statutory limit.*

> *Within that total limit the jury may exercise a broad discretion.*

396 S.W.2d at 616–17 (emphasis added) (emphasized material was deleted in MDC quotation).

**8.** Cal.Civil Code, § 3294 (West, 1970), provides:
> In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.

absent an affirmative showing to the contrary, a court should presume that the forum state would apply its own law concerning punitive damages in a wrongful death action. The Hawaii law regarding punitive damages will be discussed in Part X of this opinion.

In summary, we find that the "line-up" of the states involved regarding the issue of punitive damages is as follows: Illinois, place of the injury, does not allow punitive damages. Missouri, MDC's principal place of business, does allow punitive damages, but California, place of MDC's conduct, does not. New York, one principal place of business of American, does not allow punitive damages while Texas, another principal place of business of American, does. Oklahoma, the place of American's conduct, does allow punitive damages.

### III

It is now necessary to examine the constitutional objections to the disallowance of punitive damages. For there would be no conflict at all if it is unconstitutional to disallow punitive damages in wrongful death actions.

**9.** The district court first held that the equal protection clauses of the Illinois and Michigan constitutions were coextensive with the equal protection clause of the federal constitution, *citing Friedman & Rochester, Ltd. v. Walsh*, 67 Ill.2d 413, 10 Ill.Dec. 559, 367 N.E.2d 1325 (1977); *Commissioners of Highways of Town of Annawan v. United States*, 466 F.Supp. 745, 769 (N.D.Ill.1979); *Moore v. Spanglar*, 401 Mich. 360, 258 N.W.2d 34 (1977).

The district court then turned to California. It found that the California equal protection clause was fundamentally equivalent to that of the federal Constitution but that it required "some rationality" in the nature of the class singled out. The court held that the denial of punitive damages was rational and that, therefore, such denial did not offend the California constitution.

Finally, the district court examined the prohibition of "special legislation" in the Illinois Constitution, Art. 4, § 13. The court rejected the argument that Illinois' denial of punitive damages constituted "special legislation," *citing Smith v. Hill*, 12 Ill.2d 588, 147 N.E.2d 321 (1958); *Siegall v. Soloman*, 19 Ill.2d 145, 166 N.E.2d 5 (1960); *Adams v. Continental Cas. Co.*, 21 Ill.App.3d 111, 314 N.E.2d 495 (1974); *aff'd McRoberts v. Adams*, 60 Ill.2d 458, 328 N.E.2d 321 (1975); *Rincon v. License Appeal*

In the district court below, plaintiffs raised two general constitutional objections. First, they argued that the preclusion of punitive damages in wrongful death actions, where they are permitted in personal injury survival actions, is a violation of the equal protection clause of the federal and of the Illinois, Michigan, and California constitutions. In addition, certain plaintiffs argued that the existence in Illinois of the difference in damages between survival and wrongful death actions represents "special legislation" of the type prohibited by Art. 4, § 13 of the Illinois Constitution. The district court rejected both arguments.

 On this appeal, the only specific constitutional attack is the argument that New York's denial of punitive damages violates the federal equal protection clause. Proceeding to the federal equal protection analysis, we affirm, for the reasons below, the district court's holding that statutes which deny punitive damages in wrongful death cases but allow such damages in other personal injury actions do not run afoul of the federal Constitution.[9]

*Commission of City of Chicago*, 62 Ill.App.3d 600, 19 Ill.Dec. 406, 378 N.E.2d 1281 (1978); and *Friedman & Rochester, Ltd. v. Walsh*, 67 Ill.2d 413, 10 Ill.Dec. 559, 367 N.E.2d 1325 (1977).

The plaintiffs do not directly challenge any of these findings by the district court. Illinois plaintiffs Plesas do, however, raise some arguments which, *inter alia*, imply a challenge based on Illinois constitutional grounds. The Plesas' first argument is not a constitutional argument but a response to MDC's argument that Illinois would refuse to enforce Missouri's law allowing punitive damages. They argue that it is not the case that Illinois would refuse to enforce Missouri's law. Since our analysis of the conflicts issue does not rely on this MDC argument, we do not reach the Plesas' first argument.

The Plesas' second argument seems to be that the denial of punitive damages is unconstitutional under Illinois law. But they do not press this argument as such. Rather, they seem to argue that this Court should abstain from deciding the Illinois constitutional challenge and allow Illinois courts to decide it. Plaintiffs request abstention under Circuit Rule 13 of this Court which provides the power to certify "questions arising under the laws of that state which will control the outcome of a

The wrongful death statutes in question involve a legislative classification which allows punitive damages in certain personal injury actions but denies punitive damages in wrongful death cases. This classification does not involve any suspect class. *See Parham v. Hughes*, 441 U.S. 347, 351, 99 S.Ct. 1742, 1745, 60 L.Ed.2d 269 (1979) and *Huff v. White Motor Corp.*, 609 F.2d 286, 298 (7th Cir. 1979). Nor does this classification affect fundamental rights. *See Huff*, 609 F.2d at 298. Thus, the classification is not to be examined with "strict" or even "intermediate" scrutiny [10] but is to be examined by the "rational relationship" test. The classification must be rationally related to a legitimate state purpose in order to pass constitutional muster with regard to the equal protection clause. *Huff; Parham; Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1979); *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978); and *Williamson v. Lee Optical*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

Recently, this Court considered this same issue in *Huff*, 609 F.2d 286, which involved an equal protection challenge to Indiana's wrongful death statute. That law, like the laws challenged here, allowed punitive damages in other personal injury cases but not in wrongful death cases. In *Huff*, we found the legislation was rationally related to a legitimate state interest and therefore passed equal protection scrutiny. The plaintiffs here argue that the treatment of this question in *Huff* was perfunctory and request that we review the question again. We agree the discussion of this issue in *Huff* was not elaborate. But in reexamining the issue, we reach the same result.

Very recently, the Ninth Circuit Court of Appeals confronted a similar equal protection challenge to a state's denial of punitive damages in wrongful death actions. In its decision in *In Re Paris Air Crash*, 622 F.2d 1315 (9th Cir. 1980), the Ninth Circuit found the classification denying punitive damages to survive the rational relationship test. We find the Ninth Circuit opinion persuasive and reach the same result here for the following reasons.

First, the United States Supreme Court recently has sustained tort liability limitations in *Duke Power Co. v. Environmental Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57

case pending in federal court." This second argument, then, presents two issues for resolution by this Court.

First, because we are not confronted with a specific challenge to the district court's finding that the Illinois equal protection guarantee is coextensive with the federal equal protection guarantee, we decline to disturb the district court's finding.

Second, we find that abstention is not appropriate. As the United States Supreme Court stated in *Babbitt v. Farm Workers*, 442 U.S. 289, 306, 99 S.Ct. 2301, 2313, 60 L.Ed.2d 895 (1979), a case cited by the Plesas, there is a fundamental prerequisite for abstention. "[T]he abstention doctrine 'contemplates that deference to state court adjudication only be made where the issue of state law is uncertain.'" *Harman v. Forssenius*, 380 U.S. 528, 534, 85 S.Ct. 1177, 1181, 14 L.Ed.2d 50 (1965). But as we discussed in Part II, we do not find the issue of whether Illinois denies punitive damages to be uncertain. To the contrary, we find the Illinois Supreme Court's affirmation of *Mattyasovszky* clear authority for the fact that Illinois does deny punitive damages in wrongful death cases. Thus, we decline plaintiffs' invitation to abstain.

10. In *In re Paris Air Crash*, 622 F.2d 1315, 1319 n. 4 (1980), the Ninth Circuit Court of Appeals held that the "rational relationship" test—and not any higher level of scrutiny—should be used in examining the denial of punitive damages in wrongful death actions. The court stated:

> We do not apply a middle-tier analysis for three reasons. First, both state and federal Supreme Courts have declined frequent invitations to announce or articulate such an analysis. Second, both courts have analyzed tort recovery limits in terms of a rational bearing upon a legislative objective. Third, the relatively nongrievous deprivation, if indeed it can be called such, of a limit on who may act as a private attorney general by seeking punitive damages makes this case particularly inappropriate to inaugurate such an analysis. Additional drawbacks of this proposed innovation are discussed in *Hawkins v. Superior Court*, 22 Cal.3d 584, 607–10, 150 Cal.Rptr. 435, 450–51, 586 P.2d 916, 931–32 (1978) (Bird, C. J., concurring); Linde, *Due Process of Law Making*, 55 Neb.L.Rev. 197 (1976).

622 F.2d 1315, 1319 n. 4.

L.Ed.2d 595 (1979), and *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978). In those cases, the damage limitations were more severe than the damage limitation here. There, the challenged laws limited the types or amounts of *compensatory* relief. Here, the limitation is the denial of *punitive* relief; compensatory damages are unaffected. Thus, the limitations themselves are not irrational.

Second, the purpose of denying punitive damages is to avoid excessive liability. Such denial represents a legislative determination that a state's interest in protecting defendants from excessive damages outweighs its interest in punishing or deterring misconduct. *See In Re Paris Air Crash*, 622 F.2d at 1319, and *Jackson v. K. L. M.*, 459 F.Supp. 953, 956 (S.D.N.Y.1978). The state has legitimate interests in both the amount of damages paid to survivors of persons wrongfully killed and in protection of defendants.[11] The denial of punitive damages is clearly a rational method of limiting damages in wrongful death cases. *See In Re Paris Air Crash*, 622 F.2d at 1319. For these reasons, then, we find that a state's decision to limit punitive damages does pass constitutional muster under the rational relationship test. We note also that in every case of which we are aware, every court which has confronted this question has arrived at this same conclusion. *See, e. g., In re Paris Air Crash; Huff; Johnson v. International Harvester Corp.*, 487 F.Supp. 1176 (D.N.D.1980); and *Robert v. Ford Motor Co.*, 73 App.Div.2d 1025, 424 N.Y.S.2d 747 (1980).[12]

### IV

We now confront the actual conflicts issues among the various states. It is not disputed that, since federal jurisdiction is based on diversity of citizenship, the choice-of-law rules to be used are those choice-of-law rules of the states where the actions were originally filed. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *VanDusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964); *In Re Air Crash Disaster of Boston, Massachusetts*, 399 F.Supp. 1106 (D.Mass.1975). We will consider the law of each state in turn. We emphasize at the outset that the tests to be used, although containing significant differences, mandate an analytical inquiry which is basically the same. As Professor Leflar has stated:

> [I]t appears that the various scholarly views concerning choice of law, developed during the last couple of decades, are being accepted by the courts as though they constituted one somewhat multi-faceted approach to the subject. Essentially, they are consistent with each other. Any one of them is likely to produce about the same result on a given set of facts as will another . . . .
>
> The point to be emphasized is that the modern decisions, regardless of exact language, are substantially consistent with each other.

Leflar, American Conflicts Law, § 109, p. 218 (3d ed. 1977).

In general, we must attempt to determine which, if any, of the states having some relationship to the parties or to the crash has the most significant interest in the application of its own substantive law to the merits of the punitive damage issue. The application of choice-of-law

---

**11.** A state may even determine, for example, that its interest in maintaining accurate and efficient disposition of property at death is best served by limiting damages to exclude punitive damages. *See Parham v. Hughes*, 441 U.S. at 357, 99 S.Ct. at 1748.

**12.** Finally, plaintiffs argue that this Court must find the denial of punitive damages in wrongful death cases unconstitutional because, so long as this denial continues, there will continue to be some truth to the adage that "it is cheaper to kill a victim than to injure him." Unfortunately, this adage has become an adage *because* there is some truth to it.

The decision of under what circumstances punitive damages should be allowed is for the state legislatures and not this Court. Neither with regard to the constitutional argument, nor with regard to the conflicts analysis, do we take into consideration the wisdom of specific decisions regarding punitive damages.

rules is not a mechanical process of cranking various factors through a formula. Critical to conflicts analysis is the notion that we must examine the choice-of-law rules not with regard to various states' interests in general, but precisely, with regard to each state's interest in the specific question of punitive damages. Thus, we approve the concept of "depecage": the process of applying rules of different states on the basis of the precise issue involved.[13]

The depecage process has recently been approved and utilized by the Court of Appeals for the Third Circuit in an aircraft products liability case involving a choice between standards of liability. *Reyno v. Piper Aircraft Co.*, 630 F.2d 149 (3d Cir. 1980), *petit. for cert. filed* (1980).[14] Depecage has also been endorsed by many conflicts scholars.[15] The task of conflicts analysis using depecage requires creativity and precision. With this admonition in mind, we begin our analysis.

## V

We begin with the actions filed in Illinois. The Illinois courts apply the "most significant relationship" test of the Restatement (Second) of Conflict of Laws ("Restatement (Second)") to determine the applicable law in wrongful death actions. This test incorporates a presumption that the local law of the state where the injury occurred should govern, unless another state has a "more significant relationship" to the occurrence or to the parties.[16] *Ingersoll v. Klein*, 46 Ill.2d 42, 48, 262 N.E.2d 593, 596 (1973).

The Restatement (Second) provides two sets of criteria for the measurement of the "most significant relationship." The first set of criteria includes general factors such as the needs of the interstate system; relevant policies of the forum and other interested states; protection of justified expectations; the basic policies underlying the particular field of law; certainty, predict-

---

**13.** In our case, there is only one relevant issue: the choice of law regarding punitive damages. Thus, we use the term here to mean a precise focus on the purpose of and policies behind the decision to either allow or disallow punitive damages. *See* Reese, *Depecage: A Common Phenomenon In Choice of Law*, 73 Colum.L. Rev. 58, 59–60 (1973). Professor Reese stated:

Amidst the chaos and tumult of choice of law there is at least one point on which there seems to be general agreement in the United States. This is that choice of the applicable law should frequently depend upon the issue involved. The search in these instances is not for the state whose law will be applied to govern all issues in a case; rather it is for the rule of law that can most approximately be applied to govern the particular issue ....

It also seems probable that greater use of depecage will be an inevitable by-product of the development of satisfactory rules of choice of law. In contrast to the broad rules that have been tried and found wanting, the new rules, if we are indeed to develop such rules, are likely to be narrow in scope and large in number....

In short, a willingness to make a liberal use of depecage would seem a prerequisite to the satisfactory development of narrow rules of choice of law.

**14.** Referring to depecage and the Reese article, *id.*, the court said, with regard to California choice-of-law:

Although the California Supreme Court has not explicitly adopted this method, it is implicit in that court's analysis of cases and it is consistent with modern governmental interest analysis to examine comparative governmental interests as to each issue, to the extent the issues are separable and the balance of comparative interests may vary.

*Reyno,* at 167.

**15.** *See* Reese, *Depecage, id.*; Leflar, *American Conflicts Law*, § 109, pp. 221–22 (3d ed. 1977) *citing* Wilde, *Depecage in the Choice of Tort Law*, 41 S.Cal.L.Rev. 329 (1968).

**16.** The Restatement (Second) § 175, § 178 (1971) provides as follows:

§ 175. Right of Action for Death. In an action for wrongful death the local law of the state where the injury occurred determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

§ 178. Damages. The law selected by application of the rule of § 175 determines the measure of damages in an action for wrongful death.

ability and uniformity of result; and ease in the determination and application of the law to be applied.[17] The second set of criteria includes the contacts to be taken into account in applying these principles. These contacts are: (1) the place of the injury; (2) the place of misconduct; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship between the parties is centered.[18] These contacts are to be evaluated according to their relative importance to the issue involved and according to the purposes sought to be achieved by the relevant rules of the interested states.[19]

## A

Turning to defendant MDC, the precise issue, of course, is which state's law regarding the availability of punitive damages should apply. The states having contacts to be taken into account are: Illinois, place of injury; California, place of MDC's alleged misconduct; Missouri, MDC's principal place of business; and, if it can be determined, the states where the relationship between the parties is centered.

It is unclear where the relationship of the parties is "centered". As the district court noted, most of the Illinois actions involve Illinois decedents who purchased their tickets in Illinois for a flight which began in Illinois. But the flight was *to* California. Surely the importance of the place of destination of a journey is just as great as the importance of the place of departure. This issue need not detain us, however, because neither California nor Illinois allows punitive damages.[20]

We next turn to the interests of the states of domicile of the plaintiffs. The domiciliary states do not have an interest in disallowing punitive damages because the decision to disallow such damages is obviously designed to protect the interest of resident defendants, not to effectuate the interest of the domiciliary states in the welfare of plaintiffs. *E. g., Hurtado v. Superior Court*, 11 Cal.3d 574, 114 Cal.Rptr. 106, 110, 522 P.2d 666, 670 (1974).

Nor do the domiciliary states have an interest in imposing punitive dam-

---

17. The Restatement (Second), § 6, (1971), provides:

§ 6 Choice of Law Principles
(1) A court, subject to constitutional restriction, will follow a statutory directive of its own state on choice of law.
(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectation,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

18. The Restatement (Second), § 145, provides:

§ 145 The General Principle
(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most sig-

nificant relationship to the occurrence and the parties under the principles stated in § 6.
(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
(a) the place where the injury occurred,
(b) the place where the conduct causing the injury occurred,
(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
(d) the place where the relationship, if any, between the parties is centered.
These contacts are to be evaluated according to their relative importance with respect to the particular issue.

19. *See Id.*, § 145, Comment c, at 416–17.

20. Moreover, the place where the relationship is centered would seem to have a low interest in either punishment or protection merely because the parties' relationship was centered within its borders. The alleged egregious acts would not have occurred there; thus, the state would have a low interest in controlling nonresident corporate behavior. Also, because the corporations were not located in that state, it would have a low interest in the protection of nonresident defendants.

ages on the defendants. The legitimate interests of these states, after all, are limited to assuring that the plaintiffs are adequately compensated for their injuries and that the proceeds of any award are distributed to the appropriate beneficiaries. *E. g., Hurtado,* 11 Cal.3d at 584, 114 Cal.Rptr. at 112, 522 P.2d at 672. Those interests are fully served by applying the law of the plaintiffs' domiciles as to issues involving the measure of *compensatory* damages (insofar as that law would enhance the plaintiffs' recovery) and the distribution of any award. Once the plaintiffs are made whole by recovery of the full measure of compensatory damages to which they are entitled under the law of their domiciles, the interests of those states are satisfied.

■■■ We thus return to the interests of the three relevant states, Illinois, California, and Missouri. Illinois and California do not allow punitive damages but Missouri does. If the interests of these three states were to be weighed equally, the tally would be two-to-one against allowing punitive damages. But the process of weighing states' interests requires more than merely tabulating the states pro and con. We must examine the precise interest of each state with regard to the purpose of punitive damages.[21]

■■■ The purposes underlying the allowance of punitive damages, as the district court noted, are punishment of the defendant and deterrence of future wrongdoing. The purpose underlying the disallowance of punitive damages is protection of defendants from excessive financial liability. Two states which very definitely have an interest in punishment or protection are California and Missouri, the states in which, respectively, the conduct occurred and the principal place of business is located. Both states have an obvious interest in preventing future misconduct; both states have an obvious interest in protecting businesses located or acting within its borders. Illinois, the place of injury, also has an interest in the punitive damages question; its interest will be discussed after the discussion of Missouri's and California's interests.

■■■ MDC's wrongful conduct here complained of involved the design and manufacture of the DC–10. Because the corporate headquarters of MDC is located in Missouri, Missouri has an obvious interest in deterring wrongful conduct in such design and manufacture, even if the actual work was performed in California. To find otherwise would be to gut the very concept of corporate accountability. Moreover, to say that Missouri has *no* interest in the imposition of punitive damages—as defendants do—would encourage rampant subterfuge and confusion. For example, many corporations have corporate headquarters in one state and far-flung operations in many others.[22] If courts held that the place of "conduct" had the critical interest in punitive damages and that the place of corporate headquarters had no interest in punitive damages, then litigation would center

---

**21.** For this reason, we reject the defendants' "grouping" theory. Defendants argue that because the law of the place of injury and the law of the place of misconduct are the same, the case must be analyzed for choice-of-law purposes as if conduct and injury occurred in the same state. Then, defendants argue, punitive damages must be disallowed. But the very "grouping" process that defendants advocate would vitiate the entire process of weighing states' interests. The result of defendants' approach would be the application of rules as wooden and mechanical as the old *lex loci delicti* rule itself, which the Restatement (Second) balancing process is designed to supplant. The Restatement (Second) § 6, at 14, states:

> In determining a question of choice of law, the forum should give consideration not only to its own relevant policies ... but also to the relevant policies of all other interested states. The forum should seek to reach a result that will achieve the best possible accommodation of these policies. The forum should also appraise the relative interests of the states involved in the determination of the particular issue. In general, it is fitting that the state whose interests are most deeply affected should have its local law apply.

**22.** In this case, for example, American maintained its corporate headquarters in New York, its operations base in Texas, its maintenance department in Oklahoma, and conducts business throughout the country.

around exactly where activities and decisions occurred. The practical effect of such a holding would be to require extensive examinations of numerous employees and to require complex investigations into the precise locations of many areas of corporate decision. Corporations seeking to avoid potential punitive damages would be encouraged to structure decisions so that no specific locus for a major decision could ever be proved to have occurred in a "punitive" state.

MDC argues that *Jackson v. K.L.M.*, 459 F.Supp. 953 (S.D.N.Y.1978) and *Sibley v. KLM–Royal Dutch Airlines*, 454 F.Supp. 425 (S.D.N.Y.1978) establish the proposition that, as between the state of misconduct and the primary place of business, the state of misconduct is the only state with an interest in awarding punitive damages. Citing these cases, it argues that Missouri, as the state of its corporate headquarters and principal place of business, has an interest only in the decision to disallow punitive damages but not in the decision to allow punitive damages. But the defendants misread the *Jackson* and *Sibley* opinions and their argument seems comparable to "heads, I win; tails, you lose" logic.

*Jackson* and *Sibley* are companion cases which involved suits by representatives of decedents who had been domiciled in states allowing punitive damages. The suits were brought against a Dutch airline for personal injuries arising from an air crash in Spain. The holding for these cases was that the states of the decedents had a proper interest only in adequate compensation, but not

in punitive damages. The only jurisdictions found to have an interest in punitive damages were the Netherlands, place of the airline's incorporation and principal place of business, and Spain, the country in which the accident and the tortious conduct occurred. But because both the Netherlands and Spain disallowed punitive damages, the court was not confronted with the need to determine whether the place of conduct had a greater or lesser interest than the principal place of business in the punitive damages question.[23] Thus, these cases do not provide support for the argument that, in our case, Missouri has any less interest than California.

■■■■ California, place of MDC's conduct in manufacture and design of the DC–10, also has a strong interest in the issue of punitive damages. California, as does every state, has a substantial interest in the economic health of corporations which do business within its borders. It derives substantial sales and income taxes, as well as other revenues, directly and indirectly from a corporation's activities within the state. Indeed, California's interest is strong with regard to a rule disallowing punitive damages because such a rule protects the economic well-being of the corporations and therefore enhances the economic well-being of the state. Moreover, the rule may have been a factor in various corporations' decisions to move to California.

The district court concluded that where, with regard to punitive damages, the law of the principal place of business conflicted with the law of the place of misconduct, the

---

**23.** The *Jackson* court did state that the domiciliary states had a lower interest in punitive damages than the place of injury because "the California Supreme Court had recognized that the interest in regulation of conduct in tort cases is primarily local in character and is the concern of the jurisdiction in which the conduct occurred." 459 F.Supp. at 955. But the *Jackson* court did not use this reasoning to downplay the interest of the Netherlands, KLM's principal place of business. Nor did the court say that Spain and the Netherlands had an interest *only* in protecting KLM from excessive financial burdens. The court was not confronted with the question of the countries' interests had they chosen to allow the financial

burdens of punitive damages. The court, which found for the defendants, characterized the defendants' argument as follows:

> KLM asserts that Netherlands, the place of KLM's incorporation and its principal place of business, and Spain, the country in which the accident occurred, are the only jurisdictions with a significant interest *in the issue of punitive damages.*

459 F.Supp. at 955 (emphasis added). By the use of the phrase "issue of punitive damages," presumably the defendants' argument, which the court had accepted, would also have been accepted had the countries allowed punitive damages.

former should prevail. The court reasoned that responsibility for corporate conduct should be uniform, regardless of where individual instances of that conduct took place. But the district court's analysis only looked at the purpose behind the decision to *allow* punitive damages. As we have discussed, both the decision to allow punitive damages and the decision to disallow punitive damages must be accorded great respect.

 Thus, we find that the balance on the scales of significant contacts is even: we cannot say that either California or Missouri has a "greater" interest in the decision whether to allow punitive damages against MDC. This situation involves a total and genuine conflict: one jurisdiction allows punitive damages, the other does not. There does not seem to be any way to arrive at a "moderate and restrained" interpretation of either policy so as to avoid a true conflict.[24]

 With the scales evenly balanced, we now turn to the interest of Illinois, the place of injury. The old rule in many jurisdictions, developed from torts other than air crashes, was that where there was nothing fortuitous about the fact that the injury occurred in a given state, great weight would be given to the law of the place of injury. But air crash disasters often present situations where the place of injury is largely fortuitous. *See Cousins v. Instrument Flyers, Inc.*, 44 N.Y.2d 698, 405 N.Y. S.2d 441, 443, 376 N.E.2d 914, 915 (1978), and sources cited therein. That the injury in our case occurred in Illinois can only be described as fortuitous. Had the DC–10's engine fallen off later, the injury might have occurred in one of any number of states. Because the place of injury is much more fortuitous than the place of misconduct or the principal place of business, its

interest in and ability to control behavior by deterrence or punishment, or to protect defendants from liability, is lower than that of the place of misconduct or principal place of business. Also, merely as the place of injury, Illinois would not have strong interests in protecting nonresident defendants from excessive financial liability.

 But the fact that the interest of the place of injury is less than the interest of the principal place of business and the interest of the place of alleged misconduct does not mean that Illinois has *no* interest in the punitive damages question. Illinois has very strong interests in not suffering air crash disasters and also in promoting airplane safety. This Court takes judicial notice that the DC–10 crash sent shock waves throughout the metropolitan Chicago area. Illinois special emergency disaster units responded to the crash. The state certainly incurred significant expense in attempted rescue operations, clean-up operations, and the necessary tasks of identifying the deceased and notifying next-of-kin.

Also, in this case Illinois is more than merely the place of injury. As noted before, many of the other contacts of significance were in Illinois. With regard to the actions filed in Illinois, all but two of the decedents resided in Illinois. As the home of O'Hare International Airport, one of the world's busiest airports, Illinois certainly has strong interests in encouraging air transportation corporations to do business in the state.

 Because Illinois has such strong interests in promoting airline safety, it would have a strong interest in allowing punitive damages to deter corporate misconduct relating to air safety. But because Illinois also has such strong interests in having

---

**24.** Kay, *Comparative Impairment, supra* note 2, at 578, *quoting* W. Reese & M. Rosenberg, Cases and Materials on Conflict of Laws 470 (7th ed. 1978). Also, we are unable to fathom a procedural compromise, such as a shift in the burden of proof, which could accommodate both policies. *See* Twerski & Mayer, *Toward a Pragmatic Solution of Choice of Law Problems—At the Interface of Substance and Procedure*, 74 Nw.L.Rev. 781 (1979); Sedler, *On

Choice of Law and the Great Quest: A Critique of Special Multistate Solutions to Choice-of-Law Problems*, 7 Hofstra L.Rev. 807 (1979). Nor are we able to determine a consensus on shared values or policies which could lead to a compromise. *See* Trautman, *A Comment on Twerski and Mayer: A Pragmatic Step Towards Consensus As a Basis For Choice-of-Law Solutions*, 7 Hofstra L.Rev. 833 (1979).

airlines fly into and out of the state, and having related air transportation companies do business within the state, it would have a strong interest in protecting air transportation companies by disallowing punitive damages. Thus, the decision made by the Illinois legislature must be accorded special weight.

As noted earlier, Illinois' choice-of-law law gives presumptive importance to the place of injury. The law of the place of injury is to be supplanted only when another state has a more significant relationship than the place of injury. Restatement (Second) § 175. Although either California or Missouri, taken separately, would have a greater interest than Illinois, the fact that the laws of these states are in absolute conflict indicates that neither state has an interest greater than the other's. Thus, in terms of a principled basis upon which a choice can be made, neither state has a "more significant interest" than Illinois. Since neither California nor Missouri can be chosen on a principled basis, the application of the "most significant relationship" test leads to the use of Illinois law.

Finally, application of Illinois law comports with the general criteria of the Restatement (Second) which emphasize certainty, predictability, uniformity of result, and ease in the determination and application of the law to be applied.[25] In this case, it is important to resolve the conflict between states by a principled means. Determining that all other factors being equal, the law of the place of injury shall be used, provides a principled means of decision which also creates certainty.

Future defendants cannot predict, of course, where airplane disasters will occur. But air transportation companies will now be on notice that, under the "most significant relationship" test, when there is a true conflict between laws of states having equal interests in the issue of punitive damages, and when the place of injury has a strong interest in air safety and in protection of air transportation corporations, the law of the place of injury will apply. Our result also comports with the Restatement (Second)'s principle that choice-of-law rules should be relatively simple and easy to apply. Restatement (Second) § 6, at 10. We conclude, therefore, that under the "most significant relationship" test, the law of Illinois should apply. For the above reasons, we grant MDC's motion to strike punitive damages claims.

### B

We now apply the Illinois "most significant relationship" test to American. The significant contacts to be examined are the place of injury, the place of alleged misconduct, the principal place of business, and the place where the relationship between the parties is centered. As discussed with regard to MDC, the place of injury is Illinois and the place where the relationship between the parties is centered is either Illinois or California. Neither of these states allows punitive damages. The place of American's alleged misconduct is Oklahoma, site of its maintenance base, which does allow punitive damages.

The place of American's principal place of business for purposes of this analysis is disputed. Prior to 1979 and during part of

---

**25.** The Restatement (Second) also lists other policies including the needs of the interstate system, the policies of the forum and other interested states, the protection of justified expectations, and the basic policies underlying the particular field of law. *See* note 17, *supra.* These other principles are not helpful in the resolution of this issue because their application can cut either way. Neither a decision for nor a decision against punitive damages will make the interstate system work better or worse. The relevant policies of the forum, as we have seen, are countered by the relevant policies of Missouri. "Justified expectations" are not an issue because MDC's corporate headquarters are in Missouri. MDC does not argue, nor reasonably could it, that it somehow justifiably expected it would not be held Missouri law for its corporate decisions. Finally, the basic policies underlying the field of punitive damages are in conflict. Each state legislature weighs the balance of deterring wrongful conduct or protecting defendants from excessive liability and then makes its decision accordingly.

1979, American's principal place of business was New York, which does not allow punitive damages. Subsequently, American moved to Texas, which does allow punitive damages. Plaintiffs argue, first, that the law of American's present principal place of business, Texas, should govern the punitive damages issue. Second, plaintiffs argue that, if the principal place of business on the date of the crash must be used, American's principal place of business on that date was Texas.

First, plaintiffs argue that since the purpose of allowing punitive damages is to control future conduct by deterrence, the current principal place of business is the only state that can control future conduct; the principal place of business on the date of the accident can no longer do so. As support for their argument, plaintiffs rely on *Miller v. Miller*, 22 N.Y.2d 12, 290 N.Y. S.2d 734, 237 N.E.2d 877 (1968), *remittitur denied*, 22 N.Y.2d 722, 292 N.Y.S.2d 107, 239 N.E.2d 104 (1968), in which the New York court found that a defendant who moved from Maine to New York, shortly after an automobile accident in Maine involving a New York resident, should be considered a New York resident for the purpose of determining the applicable law.

The *Miller* case is distinguishable from this case. In *Miller*, the plaintiffs were seeking to avoid a Maine statutory limit on *compensatory* damages in wrongful death actions. Because the *Miller* situation involved the policies of compensation of survivors, the court was concerned with determining which state had the greatest interest in compensating the New York wife and children of a New York resident. 22 N.Y.2d at 17, 290 N.Y.S.2d at 738, 237 N.E.2d at 879. The court was not confronted with the question of punitive damages, which would have raised the question of Maine's interest in protecting its defendants from liability. Moreover, by the time of trial, Maine had changed its compensatory damage law so that the previous statutory limit had been removed. Thus, the court was not confronted with a situation where Maine had any actual interest in protection of its former resident from financial liability. 22 N.Y.2d at 21, 290 N.Y.S.2d at 742, 237 N.E.2d at 882.

In the case at bar, however, New York has *not* changed its law, as Maine had. New York does have a definite interest in protecting its residents from excessive liability at the time that the event giving rise to the liability occurred. To hold otherwise would be a virtual absurdity because the purpose of a decision to impose or not impose punitive damages has to do with regulation of conduct. If a state's interest in punitive damages "vested" not at the time of conduct but only at trial, a state choosing to allow punitive damages could never deter conduct. It is true, of course, that New York made the decision to give more importance to protection of defendants than to punishment and deterrence. But the issue confronted—punishment or protection—only has meaning in terms of the time of the conduct. Otherwise, *both* the decision to allow and the decision to disallow punitive damages would have the effect of providing protection from punitive damages for the commission of any misconduct, so long as a corporation timely moved thereafter. A corporation would not be deterred from engaging in questionable conduct because it would know that it merely had to move corporate headquarters before trial in order to escape liability. Thus, the *Miller* case does not have decisive persuasive value for our situation.

As the district court indicated, the probability of corporate moves after misconduct is a major policy reason why the principal place of business at the time of the crash—not at the time of trial—must be used. If the "time of trial" rule were to prevail, defendants in "punitive" states could always easily escape such damages by moving their corporate headquarters to a "non-punitive" state. Moreover, the "time of trial" rule should be rejected because, under that rule, there would be no certainty regarding when the "current" principal place of business should be determined. Even "innocent" corporate moves could occur at any number of times: between the

accident and the beginning of trial, during lengthy litigation, and also during lengthy appeals. The use of the date of the accident provides clarity regarding exactly when the principal place of business is to be determined.

Plaintiffs' final argument for the use of the current principal place of business is that the decision on punitive damages deals with future behavior and the only state that has an interest in future behavior is the state where the defendant now lives, not the state where the defendant used to live. This argument must be rejected for two reasons. First, since the New York legislature has decided not to allow punitive damages, it has determined that protection of defendants is more important than deterrence of future conduct. Second, the goal of deterrence is not limited to the defendant in question. The entire theory of deterrence assumes that the punishment of one person will cause other persons not to engage in acts similarly punishable. Thus, in a "punitive" state, even if the goal of deterrence can no longer be achieved with regard to a defendant who has moved, it can still be achieved with regard to other defendants within the state. For these reasons, we find the principal place of business to be used in the "most significant relationship" test must be determined on the date of the crash.

Plaintiffs next argue that American's principal place of business on the date of the crash was Texas, not New York, as held by the district court. Plaintiffs advance two subarguments. First, they argue that American's corporate headquarters had moved to Texas by the date of the accident. Second, they argue that even if the corporate headquarters had not moved by that date, the operations base was in Texas and some cases have held that the operations base, not the corporate headquarters, determines where the principal place of business of an airline is located.

Plaintiffs allege, correctly, that there are inconsistencies in the pleadings regarding American's principal place of business. They allege, and American does not deny, that in the pleadings in these consolidated cases, American gave inconsistent answers, stating in some cases that its principal place of business was in Texas and denying in other cases that its principal place of business was in Texas. Part of the problem seems to be that neither the complaints nor the answers specifically zeroed in on the question of "when" American's principal place of business was "where". Thus, American argues that in those answers admitting that its principal place of business was Texas, the answers referred to the principal place of business at the date of the filing of the complaint, not at the time of the crash. Because of the lack of precision by both defendants and plaintiffs regarding the date of the allegations and denials of principal place of business, we cannot overturn the district court's finding merely on grounds of inconsistent pleadings.

Plaintiffs next argue that the district court's determination that American's principal place of business on the date of the crash was New York was made on the basis of matters outside the pleadings: American's unverified assertion in its reply brief that its place of business on the date of the crash was New York. Because the issue was American's motion to dismiss punitive damage claims for failure to state a claim upon which relief can be granted, the governing rule is Rule 12(b) of the Federal Rules of Civil Procedure. Rule 12(b) requires that, if matters outside the pleading are presented with regard to a motion to dismiss for failure to state a claim, then the motion shall be treated as one for summary judgment and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.[26]

---

**26.** Federal Rule of Civil Procedure 12(b) provides:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading

to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for sum-

Plaintiffs correctly argue that, because the district court did consider matters outside the pleadings within the meaning of Rule 12(b), the motion should have been treated as one for summary judgment and disposed of in accordance with Rule 56. The district court did err in that it considered the motion as a motion to strike under Rule 12(b) and not as a motion for summary judgment under Rule 56. Plaintiffs argue that this error was significant because, thus, neither affidavits nor certified papers were filed and no reference to discovery was made by any party.

But the error made by the district court on this matter must be considered harmless for two reasons. First, plaintiffs misunderstand the scope of the protection of Rule 56. Rule 56 provides that a defendant in a lawsuit may "at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof." Fed.R.Civ.P. 56(b). Thus, even if the district court had treated the motion as one for summary judgment, it could have decided the question exactly as it did and there could be no objection to the defendant's failure to provide supporting affidavits.

Second, plaintiffs argue that American's principal place of business was determined before discovery was taken on the matter. But subsequent discovery on this issue has proven fatal to the plaintiffs' argument.

The unrefuted deposition testimony of Donald Lloyd-Jones, Senior Vice President of Operations of American, the transcript of which was made a part of the Record on Appeal at plaintiffs' request, disproves plaintiffs' assertion that Texas was American's principal place of business on May 25, 1979:

Q. Tell me about the move from New York if you will. Was it done in steps, throughout 1979?

A. No, we did the entire move in approximately six weeks time period. The first function moved to Dallas was the systems operations control center. That was about July 9th or 10th.

Q. When was the decision made to move to Dallas?

A. November of '78.

Q. Was anything done to implement that move until July of '79?

A. Could you be specific? There was planning obviously going on. I am not sure what you mean.

Q. Were any departments moved down there before July of 1979?

A. No sir.

Deposition of Donald Lloyd-Jones, Record MDL 391 # 2, 2, at 42.[27]

Plaintiffs also rely on the fact that American supplied a Texas address as the "address of principal executive offices" on the form 10–Q filed by American with the Securities and Exchange Commission for the quarter ending June 30, 1979. But the form 10–Q was dated August 10, 1979, and was filed on August 14, 1979. The information supplied on the form contains no reference to the crash on May 25, 1979. Thus, the inference is stronger that the address refers to American's address on the date

mary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.
Fed.R.Civ.P. 12(b).

27. The deposition of Mr. Lloyd-Jones continued:

Q. Was any space taken down here before July '79?

Mr. Long: Do you mean physically moved into or contracts signed?

Mr. Morgan: Leased, bought, built?

Mr. Long: All of those?

Mr. Morgan: All of those.

Mr. Long: The question is compound, ambiguous and vague.

Mr. Morgan: Leased? How is that?

Mr. Long: That is fine.

A. Lease was entered into, it's certainly a matter of record when that was signed. I don't honestly remember when that was signed. But it is a matter of record.

No one moved, however, until July. There was no work done on preparation of the facility, until starting some time in June, to the best of my recollection.

Q. I guess we can't move you down here into punitive country, then.

Record, MDL 391 # 2, 2, at 42–3.

the form was signed than on the date of the crash. Therefore, we find the district court's conclusion that American had not yet moved its corporate headquarters to Texas on the date of the crash was correct.

Finally, the plaintiffs, citing *Herschel v. Eastern Airlines, Inc.*, 216 F.Supp. 347 (S.D. N.Y.1963) and *Clothier v. United Airlines, Inc.*, 196 F.Supp. 435 (E.D.N.Y.1961), argue that even if American's corporate headquarters was not in Texas on the date of the crash, its operations base was located in Texas and the operations base, not the corporate headquarters, should determine where the principal place of business of an airline is located. But the cases relied on by the plaintiffs are not persuasive. First, these cases involved a determination of principal place of business for purposes of establishing diversity, not applicability of punitive damages.

■ Second, even if we look to diversity rules, this circuit applies the "nerve center" test to determine diversity issues.[28] *See Celanese Corp. of America v. Vandalia Warehouse Corp.*, 424 F.2d 1176, 1178 (7th Cir. 1970); *Sabo v. Standard Oil Co. of Indiana*, 295 F.2d 893, 895 (7th Cir. 1961). The mere fact that American's operations base was located in Texas on the date of the crash does not suggest that the operations center was the true "nerve center" of American's activities. Indeed, American's "system operations control center" was in New York on the date of the crash and did not move to Texas until July, 1980. Deposition of Donald Lloyd-Jones, Record, MDL 391 # 2, at 42.

■ For the foregoing reasons, plaintiffs have a very weak argument for placing American's principal place of business in Texas on the date of the crash. Plaintiffs request a remand for additional discovery. But such a remand would seem to be a useless exercise whose only purpose would be to delay this litigation. Moreover, denial of such a remand is appropriate because plaintiffs did not seek to respond in the court below to American's assertion that its principal place of business was New York; nor did they file a motion to vacate after the district court's ruling was announced. Rather, the plaintiffs waited to announce their surprise in this Court.[29]

It is true the record certainly could have been developed more to specify precise facts regarding where various activities of American were carried out. But, given the unrefuted deposition of Mr. Lloyd-Jones clearly establishing that American had not yet moved its headquarters to Texas on the date of the crash, we conclude that the need for finality on this matter outweighs the faint possibility that further discovery would change the district court's conclusion. Therefore, we affirm the district court's conclusion that American's principal place of business on the date of the crash was in New York.

■ We now turn to the specific conflict of laws regarding American. Oklahoma, the place of American's alleged misconduct does allow punitive damages, but New York, American's principal place of business does not. Just as we concluded with regard to MDC, we conclude that the place of conduct and the principal place of business each have strong interests in having its law

**28.** In the *Herschel* case, the court did not even characterize the facts as involving a direct conflict between the "nerve center" and the place of operations since both were found to be in Miami. 216 F.Supp. at 349.

**29.** Plaintiffs Nary argue that they accepted American's answer that its principal place of business was Texas and that they have never had the opportunity to reply to American's Reply Memorandum which contained the assertion that American's principal place of business at the time of the crash was New York. But, as noted above, the confusion regarding principal place of business in the pleadings is due in part to the fact that plaintiffs' original complaint did not refer to any date regarding American's principal place of business. American's answer, similarly, did not refer to any date. Thus, the cause of much of the lack of precision must be placed at the plaintiffs' own doorstep. The plaintiffs' argument that they never had the opportunity to respond to American's later, more precise, assertion is also weakened by the fact that they did not file a motion to vacate the district court's judgment because of this issue.

applied to the punitive damages question; we are unable to say that one state's interest is greater than the other. Thus, we follow the same analysis used above in concluding that, under the "most significant relationship" test, when the interests of the states of· alleged misconduct and primary place of business are equal and in a true and total conflict, the law of the place of injury is to be used.

■ Again, we emphasize that this result in no way signifies a return to the mechanical, wooden law of *lex loci delicti.* Rather, it emphasizes the fact that there must be some principled method of decision when the standard "interest analysis" of conflicts law cannot settle the question. Moreover, as discussed above, the choice of Illinois law is particularly appropriate here. Illinois has strong interests in both protection of airline corporations and in the deterrence of wrongful conduct by those corporations. Therefore, we affirm the district court's decision to strike the claims for punitive damages against American with regard to the actions filed in Illinois.

## VI

■ We now turn to the actions filed in California. California follows the "comparative impairment" approach to choice-of-law questions. *Offshore Rental Co., Inc. v. Continental Oil Co.,* 22 Cal.3d 157, 148 Cal.Rptr. 867, 583 P.2d 721 (1978); *Bernhard v. Harrah's Club,* 16 Cal.3d 313, 128 Cal.Rptr. 215, 546 P.2d 719 (1976).[30] The resolution of conflicts under this test is as follows. First, the respective laws of interested states are examined to ensure that

there is an apparent conflict. *Offshore Rental,* 148 Cal.Rptr. at 870, 583 P.2d at 724. There is such a conflict with regard to both MDC and American because, in both situations, the law of the place of alleged misconduct differs from the law of the principal place of business.

Second, when an apparent conflict is found to exist, the court reexamines the applicable laws and circumstances to see if a "moderate and restrained interpretation" of both the policy and the circumstances reveals that only one state has a legitimate interest in the application of its policy. *Bernhard,* 16 Cal.3d at 320, 128 Cal.Rptr. at 219, 546 P.2d at 723.[31] But as discussed with regard to the actions filed in Illinois, both the principal place of business and the place of alleged misconduct have strong interests in the protection of defendants and the deterrence of wrongful conduct. We see no restrained or moderate interpretation of either state's policy which can resolve this conflict.

■ When, as here, the reexamination of an apparent conflict reveals no way in which the conflict can be resolved by a restrained or moderate interpretation, the conflict is indeed a "true" conflict. The comparative impairment analysis "proceeds on the principle that true conflicts should be resolved by applying the law of the state whose interest would be the more impaired if its law were not applied." . *Bernhard,* 16 Cal.3d at 320, 128 Cal.Rptr. at 219, 546 P.2d at 723; *see also Offshore Rental,* 22 Cal.3d at 165, 148 Cal.Rptr. at 872, 583 P.2d at 726. This approach does not involve the court in "weighing" the conflicting governmental interests in the sense of determining which

---

**30.** *See* Kay, *Comparative Impairment, supra* note 2; Kanowitz, *Comparative Impairment and Better Law: Grand Illusions in the Conflict of Laws,* 30 Hastings L.J. 255 (1978); and Note, *After Hurtado and Bernhard; Interest Analysis and the Search for a Consistent Theory for Choice-of-Law Cases,* 29 Stan.L.Rev. 127 (1976).

**31.** Professor Kay argues that the step of moderate and restrained interpretation was integral to Professor Currie's governmental interest approach and that its use in the new comparative impairment approach announced by the Cali-

fornia Supreme Court in *Bernhard* was improper. Kay, *Comparative Impairment, supra* note 2, at 583. Although some doctrinal inconsistencies do exist between the two theories, *id.,* at 583–86, we are not convinced that this combination of theories is inappropriate. As we understand it, the point is that the reviewing court must look behind an apparent conflict to the precise issue and the precise interest of each state. This approach seems to be the very essence of the depecage concept. *See* Leflar, *American Conflicts Law,* § 109, 221–22 (3d ed. 1977).

law represents "better" social policies. Such an approach would vitiate the policies of federalism which, within constitutional limits, allow states to determine their own policies as they wish. *Offshore Rental*, 22 Cal.3d at 165, 148 Cal.Rptr. at 872, 583 P.2d at 726. *See* Horowitz, *The Law of Choice of Law in California: A Restatement*, 21 U.C.L.A.L.Rev. 719, 753 (1974). Rather, the process used by the comparative impairment approach is " 'essentially a process of allocating respective spheres of lawmaking influence.' " *Offshore Rental*, 22 Cal.3d at 165, 148 Cal.Rptr. at 872, 583 P.2d at 726, *quoting* Baxter, *Choice of Law and the Federal System*, 16 Stan.L.Rev. 1, 11–12 (1963). This process of allocation involves several steps. First, of course, the states with relevant interests must be identified.

As discussed in relation to the Illinois "most significant relationship" test, the principal place of business and the place of alleged misconduct have strong and equal relevant interests. These states have the interests of deterrence of misconduct or protection of local corporations, as discussed above. Illinois, the state in which the injury occurred, also has an important interest in the application of its law because it is a state in which both the policies of protec-tion of airline corporations and deterrence of misconduct are peculiarly important. Also as discussed with regard to the Illinois test, the domiciliary states of the plaintiffs and their representatives do not have significant interests in the punitive damages question.

The comparative impairment theory requires that the court attempt to determine the relative commitment by each interested state to the law involved. *Offshore Rental*, 22 Cal.3d at 165–66, 148 Cal. Rptr. at 873, 583 P.2d at 727. This examination of relative commitment examines two factors: (1) the current status of a statute and the intensity of interest with which it is held;[32] and (2) the "comparative pertinence" of the statute: the "fit" between the purpose of the legislature and the situation in the case at hand; *id.*, 22 Cal.3d at 166, 148 Cal.Rptr. at 872, 583 P.2d at 726, *quoting* Baxter, 16 Stan.L.Rev. 1, 12 (1963).[33]

### A

Applying California's "comparative impairment" analysis to MDC, we begin with Missouri. We look first to the current status of its interest in the application of its

---

**32.** The *Offshore Rental* Court stated:

[W]hile "[i]t is not always possible to say fairly whether [the] policy [underlying a state's law] is one that was much more *strongly held* in the past than it is now, . . . this ground of analysis should not be ignored." (Emphasis added.) (Von Mehren & Trautman, *The Law of Multistate Problems* (1976) p. 337.)

Professor Freund has pointed out that "Statutes [in a domestic case], by reason of their pattern or their prevalence, may evidence a legal climate of opinion which makes less oppressive the responsibility of the judge in choosing between . . . two possible rules of law. . . . A similar resort may be made in multistate cases. *If one of the competing laws is archaic and isolated in the context of the laws of the federal union, it may not unreasonably have to yield to the more prevalent and progressive law, other factors of choice being roughly equal . . . .*" (Emphasis added.) (Freund, *Chief Justice Stone and the Conflict of Laws* (1946) 56 Harv.L.Rev. 1210, 1216.) . . . .

Moreover, a particular statute may be an antique not only in comparison to the laws of the federal union, but also as compared with the laws of the state of its enactment. Such a statute may be infrequently enforced or interpreted even within its own jurisdiction, and, as an anachronism in that sense, should have a limited application in a conflicts case. 22 Cal.3d at 165–66, 148 Cal.Rptr. at 872, 583 P.2d at 726 (emphases by the *Offshore Rental* court).

**33.** The *Offshore Rental* court stated:

The policy underlying a statute may be less "comparatively pertinent" if the original object of the statute is no longer of pressing importance: a statute which was once intended to remedy a matter of grave public concern may have fallen in significance to the periphery of the state's laws . . . .

Moreover, the policy underlying a statute may also be less "comparatively pertinent" if the same policy may easily be satisfied by some means other than enforcement of the statute itself.

*Offshore Rental*, 22 Cal.3d at 166, 148 Cal.Rptr. at 872–73, 583 P.2d at 726–727.

punitive damages law. Despite defendants' arguments to the contrary, discussed and rejected in Part II, above, we find that Missouri permits recovery in death cases for "aggravating circumstances" when there has been a showing of "wilful misconduct, wantonness, recklessness, or a want of care indicative of indifference to consequences." *Williams v. Excavating and Foundation Co.*, 230 Mo.App. 973, 93 S.W.2d 123, 127 (1936); *Wiseman v. Missouri Pacific Railroad*, 575 S.W.2d 742, 752 (Mo.App.1978); Mo.Rev. Stat. § 537.090 (1978).

Recovery for "aggravating circumstances" has been permitted, and the provision has been maintained in the statute through many amendments, the most recent ones being in 1978 and 1979. Mo. Stat.Ann. § 537.090 (Vernon, 1980). When a statutory provision that has received judicial construction is reenacted, it is presumed that the intention of the legislature was to adopt the construction given by the court. *See* 73 Am.Jur.2d, Statutes § 331 (1974); *see also American National Ins. Co. v. Keitel*, 353 Mo. 1107, 186 S.W.2d 447 (1945); and *Gray v. McDonald*, 104 Mo. 303, 16 S.W. 398, 401 (1891). Thus, the current status of Missouri's interest in the application of its punitive damages statute seems strong.

Another factor of the "current status" test is whether a statute is "archaic and isolated" in the context of the laws of other states, *see Offshore Rental*, 22 Cal.3d at 165, 148 Cal.Rptr. at 873, 583 P.2d at 727. But, because the states in the United States are about equally divided on the punitive damages question,[34] it is not the case that either allowance or disallowance of such damages is "archaic and isolated" among other state laws.

We look, second, to the "comparative pertinence" of Missouri's punitive damages rule to this case, involving a corporation headquartered in Missouri. That is, we look to the "fit" between the purpose of Missouri's legislation and the facts here. The general purposes of allowing punitive damages are punishment of defendants and deterrence of future wrongful conduct. Those purposes are pertinent to the facts of this case. If the claims for punitive damages are allowed and are proven at trial, damage awards against MDC will be larger, perhaps significantly larger, than they would be if the claims are not allowed. Such an increase will certainly be felt by MDC to be "punishment". Similarly, such awards could be expected to deter future wrongful conduct, of the type alleged in this case, both by MDC and by other corporations based in Missouri.

Another aspect of the "comparative pertinence" test is whether Missouri's policy of deterrence can be satisfied by some means other than allowance of punitive damage claims.[35] Theoretically, it may be possible that Missouri could initiate a criminal prosecution against MDC for MDC's alleged wrongful conduct. Presumably such a criminal prosecution, if successful, could allow Missouri to achieve its goals of punishment and deterrence. But we should not overemphasize this possibility, because to do so would vitiate the "private attorney general" concept inherent in the allowance of punitive damages in civil suits.

Thus, the application of the "comparative impairment" test to Missouri produces the following results. Missouri has a strong current interest in its punitive damages law; there is a solid "fit" between the purpose of that law and its application to a Missouri-based corporation such as MDC; but, there is some slippage in that "fit" in the sense that Missouri can theoretically achieve at least some of the purposes of its law by other means.

We now examine California's interest under the comparative impairment test.

---

**34.** Plaintiffs assert, and defendants do not dispute, that no more than 22 states deny punitive damages in death cases: Alaska, California, Colorado, Georgia, Illinois, Kansas, Louisiana, Maine, Michigan, Minnesota, Nebraska, New Hampshire, New Jersey, New York, North Dakota, Ohio, South Dakota, Utah, Vermont, Virginia, Washington, and Wisconsin.

**35.** *See* note 33 *supra*.

First, we consider the current status of its policy against allowing punitive damages in wrongful death cases. Case law indicates that California seems to have a strong commitment to its policy of denying punitive damages in wrongful death cases. As the court stated in *In re Paris Air Crash*, 622 F.2d 1315 1317 n.2 (9th Cir. 1980), "California courts have uniformly held that the statute allowing punitive damage recoveries generally in tort actions is available for death recovering only in survival actions and not in wrongful death suits." *See Tarasoff v. Regents of the University of California*, 17 Cal.3d 425, 450, 131 Cal.Rptr. 14, 33, 551 P.2d 334, 353 (1976); *Pease v. Beech Aircraft Corp.*, 38 Cal.App.3d 450, 113 Cal. Rptr. 416 (1974).

In addition to case law, the refusal of the California legislature to change the law also indicates that California has a strong commitment to its no-punitive-damages rule for wrongful death cases. Although plaintiffs set forth historical and policy arguments designed to show that California has no commitment to its policy against allowance of punitive damages,[36] these arguments have not been persuasive with the California legislature. That legislature failed to amend California's wrongful death statute to include punitive damages after attention had been drawn to that omission. *See In re Paris Air Crash*, 622 F.2d 1318 n.2.

Plaintiffs argue that the legislature did not need to amend the wrongful death statute because the 1962 amendment to that statute had in effect, overturned the rule against punitive damages.[37] These arguments might be persuasive if the question before us was whether California courts *should* have a policy of disallowing punitive damages in wrongful death cases. But of course that question is not, cannot be, and should not be, before us. The question before us is whether California courts *do* have a policy against awarding punitive damages in wrongful death cases. The California Supreme Court answered that question, "yes", in *Tarasoff*, 17 Cal.3d 425, 450, 131 Cal.Rptr. 14, 33, 551 P.2d 334, 353. We are bound to follow that decision under the rule of *Erie R. R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Thus, we conclude that California has a strong commitment to its policy against allowing punitive damage claims in wrongful death cases.

Second, we now examine the "comparative pertinence" of California's legislation to the facts of this case. First, if California's no-punitive-damages rule is used in this case, the purpose of that rule, protection of defendants from excessive financial liability, will certainly be achieved. If punitive damages are disallowed, damages

---

**36.** Plaintiffs argue that analysis of legislative changes made in 1962 to the California wrongful death and survival statutes, combined with analysis of the California Law Revision Commission recommendations on which those changes were based, reveals that California policy does not truly oppose punitive damages. Plaintiffs state that in its 1960 "Recommendation and Study Relating to Survival of Actions," the Commission concluded that there was no valid reason for an exclusion of punitive damages in death cases. Plaintiffs argue that the Commission recommended that there be a new survival statute, known as § 573 of the Probate Code, which would specifically preserve a decedent's right to sue for punitive damages, and that the wrongful death statute (Cal.Civil Proc.Code § 377) be amended to exclude damages recoverable under § 573.

Both of those changes were enacted by the California legislature in 1962. Plaintiffs assert that although nothing in the legislative record indicates that the amendment to § 377 was to

overturn the earlier rule against punitive damages, that is the only possible interpretation of the amendment because the only damages recoverable under § 573 that could otherwise have been duplicated were punitive damages.

Plaintiffs argue that the Commission found that the object of awarding punitive damages was to punish a wrongdoer, and that it would be particularly inappropriate to deny such damages in a case in which the victim was killed, rather than merely injured. In the face of these conclusions, plaintiffs argue, the purpose of the 1962 amendment could only have been to end the discrimination between wrongful death cases and survival cases regarding punitive damages. Plaintiffs argue that the subsequent California cases which have recited the rule against punitive damages in wrongful death cases have failed to consider the true purpose of the 1962 amendment to § 377.

**37.** *See* note 36 *supra*.

cannot be assessed beyond the award for compensatory damages.

■ The second aspect of the "comparative pertinence" test is whether the state can achieve its policy by means other than enforcement of the statute in question. The allowance of insurance is an alternative means of vindication of a state's protective policy. As the court stated in *Offshore Rental*, "[t]he fact that parties may reasonably be expected to plan their transactions with insurance in mind may therefore constitute a relevant element in the resolution of a true conflict." 22 Cal.3d at 166, 148 Cal.Rptr. at 873, 583 P.2d at 727. California law permits defendants to insure against punitive damages.[38]

■ Having applied the "comparative impairment" test to California, we arrive at the following results. California has a strong current interest in its policy disallowing punitive damages; there is a solid "fit" between the purposes of that policy and its application to a corporation engaging in conduct in California; but, there is some slippage in that "fit" in the sense that at least some of the purposes of California's policy of financial protection theoretically can be achieved by other means, such as insurance.

■ Thus, the application of California's "comparative impairment" analysis to the states with the greatest interest in application of their laws reveals that both states have strong commitments to their respective policies. Both policies are clearly pertinent to the issue in this case: Missouri would wish to punish MDC, a Missouri-based corporation, for any wrongdoing related to the DC–10 crash; California would want to shield MDC, a corporation doing business in California, from excessive liability regarding any wrongdoing committed in California related to the DC–10 crash. We do not regard the fact that, in each state, there is a theoretical possibility that the state can vindicate its policy by, respectively, the criminal sanction or the availability of insurance, as significant enough to outweigh each state's interest in application of its respective policy. Moreover, to the extent that these theoretical possibilities do exist, they cancel each other out. Thus, we are unable to say that either state's interest would be impaired less by the failure to apply its policy.

■ We now turn to the place of injury, Illinois. As discussed above, Illinois does have significant interests under the facts of this case. Under the comparative impairment test, we first consider the current status of the Illinois policy disallowing punitive damages. This policy was examined in Part II of this opinion and, as discussed there, it is strongly held. The rule against punitive damages in wrongful death cases was recently affirmed in *Mattyasovszky v. West Towns Bus Co.*, 21 Ill.App.3d 46, 313 N.E.2d 496 (1974), *aff'd*, 61 Ill.2d 31, 330 N.E.2d 509 (1975).

■ The second aspect of a state's commitment to its policy involves the "comparative pertinence" of the state's policy to the facts of the case. Here, the "fit" between the purpose of the Illinois rule and our facts is strong. The purpose of the no-punitive-damages rule is to protect defendants from excessive liability. If Illinois law is applied, MDC, a company which designs airplanes which fly from and over Illinois, will be protected from excessive liability related to a crash that occurred in Illinois. Perhaps merely as the fortuitous place of an injury alone, Illinois might not have a special interest in protecting this corporation, headquartered in Missouri, which performed its alleged misconduct in California. But as noted in Part III, with regard to the actions filed in Illinois, Illinois was severely affected by this major disaster and Illinois also has strong interests in the protection of airplane-related industries. Because Illinois does have unique interests

---

**38.** Plaintiffs assert, ad defendants apparently concede, App.Reply Br. at 20, that California law does allow defendants to insure against punitive damages. *See* 39 Cal.Jur.3d § 319, at 580–81 (Insurance for "liability imposed by law . . . would appear to cover exemplary as well as compensatory damages when so imposed by final judgment.").

in both the awarding and the denial of punitive damages, the decision of its legislature to deny punitive damages must be given special attention. For these reasons, then, we find that, all other factors being equal, the interests of Illinois tip the scales against the allowance of punitive damages.

The use of Illinois' interests as the deciding factor regarding the substantive question of punitive damages also comports with principles of certainty and uniformity. Our result under current California choice-of-law law is consistent with our result under Illinois choice-of-law law, which requires the adoption of the law of the place of injury, unless another state has a greater interest in the application of its law. Although California choice-of-law law does not require this result, nothing in our approach is inconsistent with California law.

▮ Finally, although the California "comparative impairment" test is relatively new, the result we reach is also consistent with the result a California court probably would have reached prior to the recent adoption of comparative impairment analysis. Comparative impairment has only been used in two cases by the California Supreme Court, *Offshore Rental*, 22 Cal.3d 157, 148 Cal.Rptr. 867, 583 P.2d 721, and *Bernhard*, 61 Cal.3d 313, 128 Cal.Rptr. 215, 546 P.2d 719. Using the test in those cases, the court was able to identify a state whose interest would be "more greatly" impaired by the failure to apply its laws. But the California Supreme Court has not confronted a situation where, under the comparative impairment test, the states with the most relevant interests also were determined to have equal interests. Perhaps in such a situation, the California Supreme Court would apply the test used prior to comparative impairment. Whether it applied the rule of *lex loci delicti, see Bernhard*, 128 Cal.Rptr. at 216, 546 P.2d at 720, or Professor Currie's rule that in a true conflict, the law of the forum should always be applied, *see id.*, at 722–23; *see also* Kay, *Comparative Impairment, supra* note 2, at 583, the result would be a decision not to allow the punitive damage claims. For all of the

foregoing reasons, therefore, we reverse the district court and grant MDC's motion to strike the punitive damage claims with regard to the actions filed in California.

### B

▮ We now considered the punitive damage claims sought against American, with regard to the actions filed in California. As discussed above, the first step in California's analysis is to determine that there is an apparent conflict of laws between the states having relevant interests in the application of their laws. The states which have the relevant interest are: the principal place of business; the place of misconduct; and, under the unique facts of this case, the place of injury.

▮ American's principal place of business at the time of the crash, as discussed above, was New York, which does not allow punitive damages. The place of American's alleged misconduct is Oklahoma, site of its maintenance base, which does allow punitive damages. Thus, we have a clear clash of law regarding interested states. As discussed above with regard to MDC's principal place of business and place of alleged misconduct, we see no way to reach a compromise via a moderate and restrained interpretation of either policy. Thus, we now examine each state's relative commitment to its policy in order to determine whether either state's interest would be less impaired by the failure to apply its law.

▮ Under the "comparative impairment" test, the first aspect of a state's commitment to its policy is the current status of that policy. The current status of the New York rule against punitive damages seems strong. In *Robert v. Ford Motor Co.*, 73 App.Div.2d 1025, 424 N.Y.S.2d 747 (1980), the court clearly held that punitive damages were not allowed under the wrongful death statute. The court stated that "[t]he remedy provided by the statute, the recovery of compensatory damages, is exclusive and may not be expanded by the courts." 424 N.Y.S.2d at 749. *See also Ratka v. St. Francis Hosp.*, 44 N.Y.2d 604,

610, 612, 407 N.Y.S.2d 458, 460, 462, 378 N.E.2d 1027, 1030, 1032 (1978).

■ The second aspect of a state's commitment to its policy is whether that policy is "comparatively pertinent" to the facts of the case. The purpose of a rule disallowing punitive damages is to protect defendants from excessive financial liability. If New York's law is applied, American, a corporation headquartered in New York, will be protected from any damages beyond compensatory damages. Thus there is a strong "fit" between the purpose of the rule and the facts before us. The next question is whether that state's interest can be achieved in other ways, such as through the availability of insurance. As discussed with regard to MDC, this factor is not of critical importance, but can add another dimension to the analysis of a state's interest. It is not clear whether a corporation can acquire insurance against punitive damages in New York.[39] For the foregoing reasons, then, it does appear that the current status of New York's law against punitive damages is strong and that there is a good "fit" between New York's policy and the facts of this case.

■ We now examine Oklahoma's interest in its policy allowing punitive damages. The Oklahoma wrongful death statute recently was amended to specify, *inter alia*, the availability of punitive damages.[40] Thus, the Oklahoma legislature seems to have a strong and current interest in the availability of punitive damages.

■ Second, regarding "comparative pertinence," the policies behind allowing punitive damages are, as discussed above, punishment of wrongdoers and deterrence of future wrongdoing. If punitive damages are assessed against American, those damages will be larger, perhaps substantially larger than compensatory damages only. American will undoubtedly perceive those additional damages as "punishment". Other corporations performing conduct in Oklahoma will certainly be deterred from engaging in similar conduct. Thus, there is a strong "fit" between the purpose of the policy allowing punitive damages and the facts of this case. Of course, as with Missouri, there is the theoretical possibility that the state could achieve its policies of punishment and deterrence through the use of the criminal sanction.[41] Although this

39. This issue was not addressed in the briefs of any of the parties.

40. Until 1979, Oklahoma's wrongful death act, in its entirety, provided as follows:

§ 1053. Death—action for. When the death of one is caused by the wrongful act or omission of another, the personal representative of the former may maintain an action therefor against the latter, or his personal representative, if he is also deceased, if the former might have maintained an action had he lived, against the latter, or his representative, for an injury for the same act or omission. The action must be commenced within two years. The damages must issue to the exclusive benefit of the surviving spouse and children, if any, or next of kin; to be distributed in the same manner as personal property of the deceased.

12 Okla.Stat.Ann. § 1053 (1977). In 1978, the wrongful death statute was expanded, by amendment to specify the damages recoverable. In addition to specifically allowing damages for loss of consortium and grief of the surviving spouse, mental pain and anguish suffered by the decedent, pecuniary loss to survivors, the grief and loss of companionship of the children and parents of the decedent, the

amendment specifically referred to the availability of punitive damages:

C. In proper cases, as provided by Section 9 of Title 23 of the Oklahoma Statutes, punitive or exemplary damages may also be recovered against the person proximately causing the wrongful death or his representative if such person be deceased. Such damages, if recovered, shall be distributed to the surviving spouse and children, if any, or next of kin in the same proportion as personal property of the decedent.

12 Okla.Stat.Ann. § 1053 (1979–80 Cum.Supp.). Section 9 of Title 23 of the Oklahoma Statutes states:

§ 9. *Jury may give exemplary damages when* in any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud or malice, actual or presumed, the jury, in addition to the actual damages, may give damages for the sake of example, and by way of punishing the defendant.

23 Okla.Stat.Ann. § 9 (1977).

41. Defendants suggest that Oklahoma could effectuate its interests in punishment and deterrence through a prosecution for murder or

possibility is relevant, it is not of great importance because, as discussed earlier, overreliance on this factor would vitiate the "private attorney general" concept inherent in all actions for punitive damages.

Thus, the application of the "comparative impairment" test to Oklahoma leads to the following conclusions. The current status of Oklahoma's policy allowing punitive damages is strong; that policy is comparatively pertinent to the facts of this case; but, there is the remote possibility that the state could vindicate its interest through use of the criminal sanction.

■■■ Regarding American, then, we are now confronted with virtually the same situation as with regard to the California actions filed against MDC. There is a true and equal conflict between the punitive damage rules of the principal place of business and of the place of alleged misconduct. Each state's interest would be equally impaired if the rule of the other state were used. The only difference between the analysis regarding MDC and the analysis regarding American is that it seems clear that insurance may be sold to cover punitive damages in California, but it is not clear that such insurance may be sold in New York. But even if the sale of such insurance is not allowed in New York, we do not deem this factor to be strong enough

to tip the scales in favor of the application of New York Law.[42]

As we did in the analysis regarding MDC, we now turn to the state with the next strongest relevant interest, Illinois. For the reasons discussed with regard to the claims against MDC, it seems proper that Illinois law, which does not allow punitive damages, should be the deciding factor. For the foregoing reasons, therefore, we hold that, with regard to the actions filed in California, the motions to strike punitive damage claims against American are granted.

### VII

■■■ We turn now to the actions filed in New York. Although the New York Court of Appeals has characterized its choice-of-law approach in varying terms, that Court has applied a relatively consistent rule. That rule was formulated in *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 749, 191 N.E.2d 279, 283 (1963). In *Babcock*, the court specifically rejected the rule of *lex loci delicti* and announced a rule it viewed as equivalent to the Restatement (Second)'s "most significant relationship" test. The court stated that the law to be applied should be that of the state with "the greatest concern with the specific issue." 12 N.Y.2d at 481, 240 N.Y.S.2d at 749, 191 N.E.2d at 283.[43] The *Babcock* rule

---

manslaughter under 22 Okla.Stat.Ann. § 134 (1969), which provides as follows:

§ 134. *Murder or manslaughter, jurisdiction in certain cases.* The jurisdiction of a prosecution for murder or manslaughter, when the injury which caused the death was inflicted in one county, and the party injured dies in another county, or out of the State, is in the county where the injury was inflicted.

22 Okla.Stat.Ann. § 134 (1969). We do not decide the applicability of this statute.

**42.** In this case, even if New York law were applied, the result would not be different because both New York an Illinois disallow punitive damage claims.

**43.** Although the *Babcock* court also characterized its choice-of-law test as "[t]he 'center of gravity' or 'grouping of contacts' doctrine," 12 N.Y.2d at 481, 240 N.Y.S.2d at 749, 191 N.E.2d at 283, the court viewed its test as the same

test used in the Restatement (Second)'s "most significant relationship" test:

Justice, fairness and "the best practical result" . . . may best be achieved by giving controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties has the greatest concern with the specific issue raised in the litigation. The merit of such a rule is that "it gives to the place 'having the most interest in the problem' paramount control over the legal issue arising out of a particular factual context" and thereby allows the forum to apply "the policy of the jurisdiction 'most intimately concerned with the outcome of [the] particular litigation' " . . . .

Such, indeed, is the approach adopted in the most recent revision of the Conflict of Laws Restatement in the field of torts. According to the principles there set out, "The local law of the state which has the most

has been followed in *Long v. Pan American World Airways,* 16 N.Y.2d 337, 266 N.Y.S.2d 513, 213 N.E.2d 796 (1965), *Tooker v. Lopez,* 24 N.Y.2d 569, 301 N.Y.S.2d 519, 249 N.E.2d 394 (1969),[44] and *Neumeier v. Kuehner,* 31 N.Y.2d 121, 335 N.Y.S.2d 64, 286 N.E.2d 454 (1972).[45]

▆▆ Because the New York test is the functional equivalent of the Restatement (Second) test, the Illinois test, the conflicts analysis with regard to New York law is the same as the conflicts analysis with re-

significant relationship with the occurrence and with the parties determines their rights and liabilities in tort"....

12 N.Y.2d at 481–82, 240 N.Y.S.2d at 749, 191 N.E.2d at 283–84 (citations omitted).

**44.** Defendants argue that the New York Court of Appeals apparently abandoned the Restatement (Second) approach in *Tooker.* But the defendants misread the *Tooker* opinion. In outlining the history of choice-of-law decisions in New York, the *Tooker* court emphasized that the court had rejected the *lex loci delicti* rule in favor of the "greatest interest" rule of *Babcock, supra,* and *Dym, supra.* Then, referring to the case of *Macey v. Rozbicki,* 18 N.Y.2d 289, 274 N.Y.S.2d 591, 221 N.E.2d 380 (1966), the *Tooker* court criticized the *Macey* decision. Referring to the *Macey* decision, the court said that:

[s]ubstituted for a rational choice-of-law rule was a method of decision based on contact counting—a method open to the same criticism of unreasonableness as the earlier *lex loci delicti* rule. This analysis has been rejected in subsequent opinions. (*Matter of Crichton's Estate,* 20 N.Y.2d 124, 133–34, 281 N.Y.S.2d 811, 819–20, 228 N.E.2d 799, 805–6 [1967], adopting the approach of the concurring opinion in Macey v. Rozbicki which adhered to the *Babcock* rule; ....)

24 N.Y.2d at 576, 301 N.Y.S.2d at 524–25, 249 N.E.2d at 398 (citation omitted).

Presumably the defendants mistakenly read the statement "[t]his analysis has been rejected," to refer to the *Babcock* rule. That statement, however, refers to the *Macey* result. Further evidence of the fact that it is *Macey* which is being rejected and *Babcock* which is being approved is seen in the *Tooker* court's approving citation of *Crichton's Estate,* which the *Tooker* court characterizes as "adopting the approach of the concurring opinion in *Macey v. Rozbicki* which adhered to the *Babcock* rule," *id.* Moreover, the *Tooker* court immediately proceeded to apply the *Babcock,* "greatest interest" rule, finding that New York had the only real interest. 24 N.Y.2d at 576, 301 N.Y.S.2d at 525, 249 N.E.2d at 398.

gard to Illinois. Thus, for the reasons discussed with regard to Illinois law, we grant the motion to strike New York punitive damage claims against both MDC and American.

## VIII

We turn now to the actions filed in Michigan. For many years, Michigan had followed the traditional rule that the substantive law of the place of injury governed all issues in tort actions. *Abendschein v. Far-*

**45.** Defendants cite *Neumeier* for the proposition that the New York Court of Appeals is turning away from the *Babcock* rule and returning to the rule of *lex loci delicti.* But defendants misread *Neumeier.* Defendants quote the *Neumeier* court as saying the court's post-*Babcock* opinions have "lacked consistency." But a full reading of the passage from which plaintiffs selectively quote reveals that the *Neumeier* court continued to endorse the *Babcock* approach and concluded that in certain types of multi-state *highway* cases, narrower rules could be formulated which would remain consistent with the *Babcock* "greatest interest" test. 31 N.Y.2d at 127, 335 N.Y.S.2d at 69, 286 N.E.2d at 457. Although the principle used in the *Neumeier* case did give preference to the place of the injury, this preference was not a return to the wooden approach of *lex loci delicti.*

Defendants finally argue that the decision in *Cousins v. Instrument Flyers, Inc.,* 44 N.Y.2d 698, 405 N.Y.S.2d 441, 376 N.E.2d 914 (1978), indicates that the New York Court now holds that *lex loci delicti* is the general rule in tort cases. But there are three significant problems with reliance on the *Cousins* opinion.

First, defendants quote the *Cousins* case with selectivity. To be sure, the court stated that the rule of *lex loci delicti* was the general rule. But the court immediately added its opinion that the *lex loci delicti* rule, even if it applied to other tort cases, did not mechanically apply to airplane crash cases because of the fortuity of the place of injury. 44 N.Y.2d at 699, 405 N.Y.S.2d at 442–43, 376 N.E.2d at 915.

Second, based on the foregoing argument, the *Cousins* court indeed, refused to apply the *lex loci delicti* rule to the airplane crash in issue. Thus, its remark regarding the general rule must be considered dicta.

Third, the approach used by the *Cousins* court is consistent with our conclusion that when the test for the state with the greatest interest cannot resolve the conflicts issue, the court is free to consider the interests of the state of injury and also matters pertaining to equity and judicial efficiency. 44 N.Y.2d at 699, 405 N.Y.S.2d at 442, 376 N.E.2d at 915.

*rell,* 382 Mich. 510, 170 N.W.2d 137 (1969); *Kaiser v. North,* 292 Mich. 49, 289 N.W. 325 (1939). In recent years, however, the Michigan courts' adherence to this *lex loci delicti* rule has weakened. Although it is now clear that Michigan Courts have rejected automatic application of the rule of *lex loci delicti,* it is not clear what the new choice-of-law law is.

 In *Sweeney v. Sweeney,* 402 Mich. 234, 262 N.W.2d 625 (1978), the Michigan Supreme Court declared that the *lex loci delicti* rule would not be applied when to do so would frustrate Michigan public policy. In discussing exceptions to the *lex loci delicti* rule, the *Sweeney* court cited approvingly the case of *Branyan v. Alpena Flying Service, Inc.,* 65 Mich.App. 1, 236 N.W.2d 739 (1975). The *Branyan* case held that the *lex loci delicti* rule did not apply to airplane accidents and concluded that the "most significant relationship" test should be used to resolve conflicts questions regarding such accidents. 236 N.W.2d at 742.[46] Thus, it appears that under Michigan law, a court would attempt to determine which state had the most significant relationship to the parties or to the occurrence such that its law should be applied. But if that test did not resolve the question, because of Michigan's strong history of following the *lex loci delicti* rule see *Sweeney,* 262 N.W.2d at 625–27, and because the *Sweeney* court declined to completely abandon that rule, we conclude that the Michigan court would then consider the law of the place of injury to be determinative.

 Since, in this case, the place of conduct and the principal place of business have equal interests in the application of their laws, we conclude a Michigan court would resolve this matter by applying the law of the place of injury, Illinois, because of Michigan's strong history of following

the *lex loci delicti* rule. Thus, we grant the motions to strike punitive damage claims against both defendants with regard to the actions filed in Michigan.

## IX

 As the district court determined, Puerto Rico applies the *lex loci delicti* test to tort actions. *Jimenez Puig v. Avis Rent-A-Car System,* 574 F.2d 37, 40 (1st Cir. 1978); *DeVane v. United States,* 259 F.Supp. 18, 20 (D.P.R.1966). The law of the place of injury, Illinois, does not permit punitive damages in wrongful death actions. Moreover, denying punitive damages here does not frustrate the public policy of Puerto Rico, since Puerto Rico does not allow punitive damages in tort actions. *Ganapolsky v. Park Gardens Development Corp.,* 439 F.2d 844, 846 (1st Cir. 1971); *Cooperativa de Seguros Multiples v. San Juan,* 289 F.Supp. 858, 859–60 (D.P.R.1968). Therefore, the district court's grant of the motions to strike punitive damage claims against both MDC and American is affirmed.

## X

Finally, we turn to Hawaii. Neither the parties nor the district court have been able to identify the choice-of-law law of Hawaii. The district court concluded that under any of the conflicts rules it considered, the law of New York or Illinois would apply to American. For that reason the district court struck all punitive damage claims against American in actions filed in Hawaii. But the district court denied the motion to strike punitive damage claims against MDC because it concluded that, under some conflicts rules, punitive damages might be assessed against MDC. We must reject the district court's reasoning.

---

**46.** The *Branyan* court stated:

We agree with [the] line of authority that the strict *lex loci delicti* rule should be abandoned in favor of the more flexible rule which permits analysis of the policies and interests underlying the particular issue before the court. More particularly, we think that considerations of public policy and analysis of

the respective interests of the jurisdictions involved should accompany the judicial decision-making process in these types of conflict-of-laws cases, and that the rule of *lex loci delicti* should no longer serve to automatically determine which body of law should govern.

236 N.W.2d at 742–43.

The inability to determine the governing choice-of-law law does not justify placing the burden on one of the parties to disprove the possibility that a choice-of-law rule would impose liability on it. We conclude that where the choice-of-law law cannot be determined, absent an affirmative showing to the contrary, the court should presume that the forum would apply its own law. *See Com'l Ins. Co. v. Pacific-Peru Const. Corp.*, 558 F.2d 948, 952 (9th Cir. 1977). We agree with the authors of the Restatement (Second) who state, "where either no information, or else insufficient information, has been obtained about the foreign law, the forum will usually decide the case is accordance with its own local law except when to do so would not meet the needs of the case or would not be in the interest of justice." Restatement (Second) § 136, Comment h, at 378.

Hawaii's law regarding punitive damages is disputed. The Hawaii Wrongful Death Act, Haw.Rev.Stat. § 663–3 (1976 Repl.), authorizes the recovery of "such damages ... as under the circumstances shall be deemed fair and just compensation, with reference to the pecuniary injury and loss of love and affection, including" itemized elements of loss.[47] The statute makes no reference to punitive damages.

Although the question of whether punitive damages are recoverable under the Act has never been squarely decided by the Hawaii Supreme Court, that Court has on several occasions declared that the purpose of the Act is "compensation for loss rather than punishment." *Greene v. Texeria*, 54 Haw. 231, 236, 505 P.2d 1169, 1173 (1973). *Accord, Ginoza v. Takai*, 40 Haw. 691, 704 (1955), *rehearing denied*, 40 Haw. 734; *Young v. Honolulu Constr. & Draying Co.*, 34 Haw. 426 (1938); *United States v. Harue Hayashi*, 282 F.2d 599, 603 n.4 (9th Cir. 1960) (applying Hawaii law). Moreover, the longstanding rule of construction followed by the Hawaii courts for "statutes creating a new cause of action for death" is that "damages must be limited strictly to the pecuniary loss to the beneficiaries caused by such death." *Enos v. Motor Coach Co.*, 34 Haw. 5, 6–7 (1934).

Plaintiffs argue that Hawaii has long recognized the award of punitive damages, but none of the cases which they cite for this proposition involved the Hawaii Wrongful Death Act here in issue.[48] Plaintiffs also embark on a tortuous argument based on a series of cases and legislative actions, concerning computation of damages at the time of death in personal injury cases, which attempts to show that Hawaii does allow punitive damages. But the series of court decisions and subsequent legislative action detailed by the plaintiffs did not involve punitive damages.[49] The plain-

---

**47.** Hawaii Revised Statutes § 663–3 (1976 Repl.) provides, in relevant part, as follows:
In any action under this section, such damages may be given as under the circumstances shall be deemed fair and just compensation, with reference to the pecuniary injury and loss of love and affection including (1) loss of society, companionship, comfort, consortium, or protection, (2) loss of marital care, attention, advice, or counsel, (3) loss of filial care or attention, or (4) loss of parental care, training, guidance, or education, suffered as a result of the death of the person by the surviving spouse, children, father, mother, and by any person wholly or partly dependent upon the deceased person.

**48.** Plaintiffs cite the following cases: *Bernard v. Loo Ngawk*, 6 Haw. 214 (1877); *Bright v. Quinn*, 20 Haw. 504 (1911); *Glover, Ltd. v. Fong*, 40 Haw. 503 (1954); *Howell v. Associated Hotels, Ltd.*, 40 Haw. 492 (1954); *Goo v. Continental Casualty Co.*, 52 Haw. 235, 473

P.2d 563 (1970); and *Anderson v. Knox*, 297 F.2d 702 (9th Cir. 1961), *cert. denied*, 370 U.S. 915, 82 S.Ct. 1555, 8 L.Ed.2d 498 (1962).

**49.** In *Rohlfing v. Moses Akiona, Ltd.*, 45 Haw. 373, 369 P.2d 96 (1962), the Hawaii Supreme Court held that a decedent's representative had a right to recovery, on behalf of the decedent, of all future earnings lost as a result of the injury and that the right to such future earnings survived in a wrongful death action. In *Greene v. Texeria*, 54 Haw. 231, 505 P.2d 1169 (1973), the Hawaii Supreme Court overruled this aspect of *Rohlfing* and held that a decedent's representative could not recover for probable future earnings. Neither case involved punitive damages, but in the *Greene* case the court emphasized that the purpose of damage awards in wrongful death actions was only compensation for loss and not punishment. The plaintiffs argue that *Greene* is inapposite because the court was concerned with

tiffs' argument shows only that one element of compensatory damages—future earnings—was specifically allowed by the legislature. It does not establish the proposition that Hawaii would allow punitive damages. For the above reasons, we conclude that Hawaii does not allow such damages.

Having determined that Hawaii law does not authorize punitive damages in wrongful death cases, we must now consider whether the application of that law would "not meet the needs of the case or would not be in the interest of justice." Restatement (Second) § 136, Comment h, at 378. Since we have denied the availability of punitive damages with regard to each other state in which actions have been filed, we do not find that the application of Hawaii law would fail to meet the needs of the case or would not be in the interest of justice.[50] In addition, we have found that the use of two modern choice-of-law theories, as well as the old rule of *lex loci delicti*, all lead to the same result in this case. We see no reason why the result with regard to the Hawaii plaintiffs should be different,

especially since Hawaii does not allow punitive damages. For these reasons, we grant the motions to strike Hawaii punitive damage claims against both defendants.

### XI

In conclusion, we agree with the district court's comments on the problems involved in determining choice-of-law issues in airplane crash cases. Airline corporations and airplane manufacturers are subject to uniform federal regulation in almost every aspect of their operations, except their liability in tort. As recently as 1978, a bill was introduced in Congress to establish a federal cause of action for injuries suffered through aviation activity. *See* H.R.10917, 124 Cong.Rec.No.17 (February 14, 1978). If this bill, or any of its predecessors, had passed, those actions would all be governed by federal law, uniform as to liability and damages, rather than by the varying laws of a number of states. *See* Note, 28 Vand. L.Rev. 621, 625 (1975). Along with the district court, we conclude that it is clearly in the interests of passengers, airline corporations, airplane manufacturers, and state

---

duplication of compensatory benefits as "punishment". The plaintiffs argue that in the case of punitive damages, the intent is precisely to punish the defendant. But the Hawaii Supreme Court seemed to strongly express the opinion that excess damages—damages beyond actual compensation—in order to punish a defendant were not appropriate under the Hawaii Wrongful Death Act. Such reasoning implies that outright punitive damages would not be countenanced.

The plaintiffs next argue that the Hawaii legislature acted to reject *Greene* by enacting § 663–8 of the Hawaii Revised Statutes to specifically reinstate the element of damages rejected in *Greene*. Haw.Rev.Stat. § 663–8 provides:

Damages, Future Earnings, Together with other damages which may be recovered by law, and legal representative of the deceased person may recover where applicable under section 663–7 the future earnings of the decedent in excess of the probable cost of the decedent's own maintenance and the provision decedent would have made for his or her actual or probable family and dependents during the period of time decedent would have likely lived but for the accident.

To be sure, the legislature did express disapproval of the court's rejection of future earn-

ings and allowed recovery for such damages. But the legislature went no further. The Hawaii legislature did not reject the *Greene* rationale that damages are only compensatory and not punitive. Rather, the legislature held only that future earnings were a proper item of compensation. Thus, there is nothing in the legislature's action which suggests that Hawaii courts may now award punitive damages.

Plaintiffs cite *Hennigan v. Atlantic Refining Co.*, 282 F.Supp. 667 (E.D.Pa.1967), *aff'd*, 400 F.2d 857 (3rd Cir. 1968), *cert. denied*, 395 U.S. 904, 89 S.Ct. 1739, 23 L.Ed.2d 216 (1969), and *Reynolds v. Willis*, 58 Del. 368, 209 A.2d 760 (1965), for the proposition that when a statute does not mention punitive damages, it should not be read to exclude such damages. But the *Hennigan* case construes Pennsylvania law and the *Reynolds* case construes Delaware law. Both cases seem at odds with the reasoning of *Greene* and the admonition of *Enos*, 34 Haw. 5, 6–7, that damages must be limited strictly to pecuniary loss.

**50.** The Hawaii plaintiffs do not even present any argument as to Hawaii's choice-of-law law. They only argue that if Hawaii law is controlling, Hawaii law does allow punitive damages. We have rejected this argument.

and federal governments, that airline tort liability be regulated by federal law. Of course, we are well aware of the fact that it is up to Congress, and not the courts, to create the needed uniform law.

For the foregoing reasons,[51] the orders of the district court in denying the motions to strike punitive damage claims against MDC are reversed, while its orders granting such motions with regard to American are affirmed. Therefore, this case is

REVERSED IN PART AND AFFIRMED IN PART.

CUDAHY, Circuit Judge, concurring:

I join without reservation in the result and commend the insight and creativity of Judge Sprecher's probing analysis. Decisive in the district court's disposition of the punitive damages problem and of considerable analytical prominence in our own is the concept that the two states of the defendants' principal places of business have a weighty interest in their respective policies toward either awarding or denying punitive damages. This view may be most significant in the case of McDonnell Douglas, domiciled in Missouri. The district court found that claims for punitive damages against this defendant could stand because of Missouri's position that tort-feasors in wrongful death cases could be subjected to damages punitive in character if "aggravating circumstances" were shown. We, in turn, have determined that major weight should be accorded to Missouri's position favoring such exemplary damages under the principle of "corporate accountability." Some question remains for me whether Missouri would, in fact, have a strong interest in imposing financial sanctions on its own corporate domiciliary, employing Missouri citizens and paying Missouri taxes, as punishment for that corporation's *extraterritorial* torts affecting non-residents of Missouri. The finding of such a Missouri interest may impute an unusual level or altruism to Missouri policy and may overstate the commitment of Missouri (or any other state) to "corporate accountability" in circumstances where both the misconduct and the injuries took place outside the borders of the domiciliary state. Nevertheless, I am willing, *arguendo* and for present purposes, to indulge these assumptions (which seem enlightened in theory). But the questions raised about state policy toward extraterritorial torts underline the need for a federal law to govern tort liability for these unthinkable air disasters.

---

**51.** Matters not expressly discussed in this opinion have nevertheless been duly considered. They have been found either wanting merit or insufficiently important to warrant discussion. Their discussion would not have altered this decision.